652 A.2d 1164

**James Allen POE**

v.

**STATE of Maryland.**

**No. 408, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Feb. 2, 1995.

M. Gordon Tayback, Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and John L. Scarborough, State's Atty. for Cecil County of Elkton, on the brief), for appellee.

Submitted before HARRELL, HOLLANDER and SALMON, JJ.

HARRELL, Judge.

On 27 January 1994, appellant, James Allen Poe, was convicted by a jury in the Circuit Court for Cecil County (Cole, J., presiding) of first degree murder of Kimberly Rice and attempted first degree murder of Karen F. Poe. Appellant was sentenced on 18 March 1994 to life imprisonment without parole on the first degree murder count, and thirty years consecutive for the attempted first degree murder count. Appellant filed a timely notice of appeal to this Court.

## ISSUES

I.    Did the court properly deny appellant's motions for judgment of acquittal?

II.   Did the court properly instruct the jury as to the doctrine of transferred intent?

III.  Did the court properly instruct the jury as to murder and attempted murder?

IV.  Did the court properly instruct the jury as to reasonable doubt?

V.    Did the court properly instruct the jury as to the substantive evidence value of prior inconsistent statements?

VI.  Did the court properly sentence appellant?

## FACTS

Appellant and Karen F. Poe were married for eleven years and had four children. In the spring of 1993, they separated and appellant moved out of their residence at 270 Hopewell Road, Rising Sun, Maryland, leaving Ms. Poe with the four children. After initiating divorce proceedings, Ms. Poe began

co-habitating with her boyfriend, Duane Rice, at 270 Hopewell Road. Mr. Rice's two children, Jason and Kimberly, visited him there every other weekend and every other Wednesday. On 9 August 1993, Donna Biggs, Ms. Poe's half-sister, and her boyfriend, Michael Sponseller, visited Ms. Poe at 270 Hopewell Road and spent the night. At that time, there were six children in the house, Ms. Poe's four children and Jason and Kimberly Rice.

The next day, 10 August 1993, appellant arrived at 270 Hopewell Road sometime between noon and 1:00 p.m. to take his four children fishing or swimming.[1] After the children got into appellant's car, appellant and Ms. Poe began to argue. Ms. Poe testified that she did not want him to take the children because she "heard he was going to Florida" and "didn't like his girlfriend." She explained that she "wasn't going to share [her] kids with no other woman." As the argument progressed, Ms. Poe threatened to call the police to "get him off the property."

Ms. Biggs testified that, at this time, she was sweeping the children's living room on the ground level in the front of the house when Ms. Poe came inside the house to make a 911 call.[2] Ms. Poe then went back outside and continued arguing with appellant. After a short time, she returned to make another call to the police. Ms. Biggs testified that she looked out the front window and saw appellant "going in the trunk." She asked Ms. Poe "what was he getting," to which she responded, "he carries a gun." Appellant returned to the front of the house with a shotgun. Ms. Biggs explained that "next thing [she knew she looked] up in front of the screen door and [appellant] has got the gun pointed in the house." Appellant

---

1. Ms. Poe testified that she and appellant did not have any visitation established at this point. She explained that "[n]ormally it was he came to see the kids when he wanted. We never had a disagreement on that."

2. Ms. Biggs testified that she was not sure whether this call was completed.

then exclaimed "take this, bitch," and shot Ms. Poe, who was standing in the center hallway leading to the front door.

Ms. Biggs immediately sought cover behind a chair in the adults' living room. She testified next that she "peeked out the door" and saw appellant reload the gun. She immediately retreated, crouched behind a nearby couch, and began praying. She then heard another shot and something hit the floor.[3] The four Poe children ran into the house. Mr. Sponseller went upstairs to get a towel for Ms. Poe, as he "was close enough to see the damage they had done to her." Ms. Poe met Mr. Sponseller on the stairs and they proceeded to wrap her arm with a towel. As they got to the bottom of the stairs, Mr. Sponseller explained that he heard Ms. Poe state that "Kimberly was shot." Noticing the extensive injuries to Kimberly,[4] who was lying in the kitchen, Mr. Sponseller called 911. While on the telephone, he witnessed appellant get into his vehicle and drive away.

Maryland State Trooper Thomas Beman was one of the officers responding to the scene. He testified that he observed three holes in the front screen door of the house and exit holes in the back door of the house. Additionally, an empty shell casing was recovered next to the front door. Beman also explained that he found a shotgun in an embankment approximately 450 feet from the front door of the house.

Pennsylvania State Trooper John A. Litchko testified that, on 10 August 1993, he stopped appellant in Chester, Pennsylvania. According to Trooper Litchko, appellant immediately stated that "he didn't mean to do it, that he loved kids." While he was being searched, appellant also stated that "he

---

3. The State conceded at trial that "the evidence only shows one [shot] going into that house."

4. Assistant Medical Examiner Margarita Korrell subsequently determined that Kimberly Rice, who was declared dead at the scene, died from a shotgun wound to the head. It is not clear from the record whether Kimberly was standing behind Ms. Poe when the shot(s) were fired, or whether Ms. Poe grabbed Kimberly to shield her from appellant.

threw the gun out the window close to the scene." Appellant was then placed in the police vehicle, whereupon he stated that "[i]t was an accident, [he] didn't mean to do it. [He] was holding the gun in the air and the gun went off."

In a subsequent statement to Pennsylvania police, appellant explained:

> I did not mean to hurt anyone. I love them all down there. What happened was that I went to see my wife and kids, who I am separated from at this time. I wanted to visit the kids and she told me to get out of there or she was going to call the police. I went to my car and got out my 12–gauge shotgun and I accidentally fired it into the house. I don't know what I hit. I just heard them start yelling and I was scared so I jumped into my vehicle and took off. . . .

Two hours later, appellant made a second statement concerning the incident. He explained that after Ms. Poe threatened to call the police, he retrieved the gun from his vehicle to dispose of it so that "he [would not] be caught with a shotgun." He changed his mind, however, and was about to return the gun to the vehicle when he "tripped over his feet and the shotgun [discharged]." When questioned by police about the discrepancies between his first and second statements, appellant responded: "Whatever. She wasn't going to let me see the kids and what's the use of living if you can't see your kids."

## DISCUSSION

Although appellant presents issues I and II as one argument in his brief, we shall consider each issue separately to facilitate our discussion.

### I.

▓ Appellant contends that the circuit court improperly denied his motions for judgment of acquittal. He argues that "[n]o substantive evidence was adduced that the appellant saw Kimberly Rice, or that he had any intention to harm." In his brief, however, appellant concedes that "the evidence, in the

light most favorable to the State, would be that the appellant intentionally fired at his wife." Consequently, appellant has waived his sufficiency claim as to attempted murder of Ms. Poe. Therefore, we discuss only appellant's argument challenging the sufficiency of the evidence to convict him of murder in the first degree of Kimberly Rice.

The State, however, argues that appellant failed to preserve this issue for appeal. Specifically, the State contends that appellant, at the close of the State's case, made a motion for judgment of acquittal only as to the *attempted* first degree murder charge, and not the first degree murder charge. Moreover, argues the State, at the close of all the evidence, appellant renewed his motion for judgment of acquittal, but again only as to the *attempted* first degree murder charge. Therefore, the State contends that "any issue regarding [appellant's] motion for judgment of acquittal as to the charges related to Kimberly Rice is not properly before [this] Court." We agree.

At the close of the State's case, counsel for appellant argued insufficiency of the evidence only as to the attempted first degree murder charge, but made no argument on the first degree murder charge. Counsel for appellant stated:

[COUNSEL FOR APPELLANT]: I want to make a motion and argue on the point of first degree attempted murder of Karen Poe. I don't believe there is any evidence produced that I heard that would support all the elements of premeditation, intention to kill, premeditation.

. . . .

[COUNSEL FOR APPELLANT]: I wanted to make that argument on that. I think that is the only one I really have a point on.

One other point, I wanted to bring up the fact, if going on transferred intent for attempted murder to murder—

As explained in *Fraidin v. State*, 85 Md.App. 231, 244, 583 A.2d 1065, *cert. denied*, 322 Md. 614, 589 A.2d 57 (1991), "[i]n a jury trial, the only way to raise and to preserve for appellate review the issue of the legal sufficiency of the evidence is to

move for a judgment of acquittal on that ground." As appellant failed to make any motion for judgment of acquittal on the murder count, he has waived his sufficiency argument on appeal.[5]

## II.

Appellant next argues that the circuit court improperly instructed the jury as to the doctrine of transferred intent. Appellant contends that "[t]he commission of the elements of the crime on [Karen Poe] does not allow for the multiplication of that intent to [Kimberly Rice] through the doctrine of transferred intent." The State suggests, however, that appellant's failure to object to the circuit court's reinstruction on transferred intent "indicated that the instruction eventually met with his approval." Therefore, argues the State, appellant failed to preserve his challenge to the transferred intent instruction.

We shall first discuss the State's preservation argument, and then, as necessary, address the merits of appellant's claim.

### Failure to Preserve

At the close of all the evidence, the trial judge indicated that he intended to give a transferred intent instruction to the jury. Counsel for appellant promptly objected, arguing that transferred intent could not be properly applied to this case. Notwithstanding this objection, the trial judge instructed the jury on transferred intent and its application to the facts of the instant case.[6] After the jury was instructed, counsel for appellant again objected to the transferred intent instruction. Counsel then made the alternative argument that the verdict sheet be altered to reflect whether the jury

---

5. As noted *supra*, although appellant did make a motion for judgment of acquittal on the attempt count, he conceded in his brief that there was sufficient evidence to support a conviction on that count.

6. The trial judge's instruction is quoted *infra*.

considered the doctrine of transferred intent in making its determination. In response to this argument, the trial judge, although refusing to alter the verdict sheet, agreed to tell the jury that "if they're going under transferred intent, they're going to have to infer that he intended to kill her." The jury was then given further instruction accordingly.[7] Counsel for appellant responded, "That's better."

The State contends that appellant's failure to except to this last reinstruction was indicative of an acceptance and approval of the amended instruction used. *See Collins v. State*, 318 Md. 269, 284, 568 A.2d 1 *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990). We disagree. It is clear from the record that the trial judge's reinstruction on transferred intent was in lieu of altering the verdict sheet, as requested by appellant, to indicate whether the jury considered the doctrine of transferred intent in making its determination. While appellant's apparent acquiescence to this instruction could be construed as a failure to preserve appellant's objection to the verdict sheet, it does not waive his right to argue on appeal the correctness of the trial judge's transferred intent instruction. Therefore, appellant's objection to the trial judge's instruction on transferred intent was properly raised and preserved for our review.

## The Doctrine of Transferred Intent

Appellant argues that the trial judge's instruction to the jury on transferred intent was error because "the intent of the attempted murder on Karen Poe could not also be transferred as the intent in the murder of Kimberly Rice." The State contends that the doctrine is applicable and was properly expounded to the jury by the trial judge. The jury was instructed as follows:

Basically, the intent follows the bullet. If I intend to kill ... Karen in this case, and my mark's not good, or bullet goes through, and I kill somebody else, and they die instead

---

7. The trial judge's reinstruction is quoted *infra*.

of Karen, that's still first degree murder on the second one because the law does not protect a person who has bad aim or is unfortunate enough to have the bullet go through the first. That is called transferred intent. The intent follows the bullet. . . .

Of course, first degree murder you have to have a fully-formed purpose . . . to kill. It's not the intent to commit serious bodily harm in that sense, that would be transferred, but it would be on the second degree verdict. If you would find, basically, from the evidence beyond a reasonable doubt that Defendant would otherwise be guilty of murder in the first degree or second degree on Karen, and by chance hit [Kimberly], then he is still guilty of first or second degree on [Kimberly].

I'm going to read—where a person intends to kill one person but instead kills another person—to put it a different way, where the deceased, Kimberly, is not the intended victim, the law is such as homicide partakes the quality of the original act. The guilt of the accused is exactly what it would have been had the shot been fired at the intended victim, instead of the person actually killed. The fact that the person actually killed was killed instead of the intended victim is immaterial. The only question is what would have been the degree of guilt if the result intended had actually been accomplished.

The intent is transferred to the person whose death has been caused; that's another way of saying—some people say that the intent follows the bullet. The person is not protected because they have a bad aim or the bullet goes through one, hits another one.

If we find from the evidence—if you find from the evidence beyond a reasonable doubt that the Defendant would have been otherwise guilty of first degree of Karen Poe, you will have a verdict in the first degree. If you determine from the evidence beyond a reasonable doubt that he would otherwise be guilty of first degree of Karen Poe, and you find Kimberly died as a result of the bullet striking her,

fired by the Defendant, then you must find the defendant guilty of first or second degree murder.

. . . .

Basically, if you do not find him guilty of assault with intent to murder in the first degree of Karen Poe, then you are—do not find—then there would be nothing to transfered [sic] to Kimberly. . . . On second degree, you technically—only difference there would be if you find that he is not guilty of attempted second degree on Karen Poe, you may or may not have transfer of intent because there you could have the intent to kill and the intent to inflict serious bodily harm, if you find him not guilty of attempted murder, because you might find intent was to inflict serious bodily harm—but that part would not transfer, second degree on Kimberly . . . if you find him not guilty.

■ The transferred intent doctrine is a legal fiction established to attribute liability to a defendant who, intending to kill one person, mistakenly kills another instead. *See* Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.12(d) (1986 & 1995 Supp.). The purpose of the rule is to ensure the adequate punishment of those who accidentally kill innocent bystanders, while failing to kill their intended victims. *Id.* The transferred intent doctrine is "borne of the sound judicial intuition that such a defendant is no less culpable than a murderer whose aim is good." *People v. Birreuta,* 162 Cal.App.3d 454, 208 Cal.Rptr. 635, 639 (1984).

The Court of Appeals recognized the continuing viability of transferred intent in Maryland common law in *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974). In that case, Gladden fired several shots without hitting his intended victim, Siegel. Instead, one of the bullets struck and killed Nixon, a twelve-year-old boy who was seated on the living room couch of his nearby home. At trial, the jury was instructed that if they found that "the Nixon child died as a result of a bullet or bullets striking him fired by this defendant, then you should find the defendant guilty of murder in the first degree." *Id.*

at 385–86, 330 A.2d 176. Gladden was convicted of first degree murder and appealed.

The Court of Appeals explained that "upon the application of the principles of common law and the overwhelming weight of judicial authority, ... the doctrine of 'transferred intent' is the law of Maryland and that the *mens rea* of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim." *Id.* at 405, 330 A.2d 176. Thus, the Court concluded:

Where, as here, there was evidence that the conduct of the petitioner, Gladden, in a reprobated state of mind, was willful, deliberate and premeditated toward Siegel, the *mens rea* for murder in the first degree was established, notwithstanding that the decedent was an unintended victim. All the elements of an intentional first degree killing were present. His responsibility for the commission of conduct proscribed by the law cannot extenuate the offense because he did not kill his supposed enemy. The purpose and malice with which shots were fired are not changed in any degree by circumstances showing that they did not take effect—because of bad aim—upon Siegel. Gladden's culpability under the law and the resultant harm to society is the same as if he had accomplished the result he intended when he caused the death of the innocent youngster. The punishment is imposed in accordance with the culpability of the accused under the law and justice is served by punishing him for a crime of the same seriousness as the one he undertook to commit.

*Id.* at 404–05, 330 A.2d 176 (footnote omitted).

In *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988), the Court addressed the specific issue of whether the doctrine of transferred intent applies to the criminal offense of attempted first degree murder. In that case, the Wilson brothers became involved in a dispute with Marvin Brown. Brown fled the scene after the Wilsons threatened to pistol-whip him. Both Wilsons then fired several shots towards Brown, who was able to avoid being hit. One of the errant shots hit Juan

Kent, an innocent bystander, causing paralysis and brain damage. The Wilsons were charged with, *inter alia,* attempted first degree murder of both Brown, the intended victim, and Kent, the unintended victim. The Wilsons were convicted on both counts and appealed their conviction of attempted murder of Kent.

The Court of Appeals affirmed, holding that "the doctrine of transferred intent applies to the crime of attempted murder and that the *mens rea* or specific intent of a defendant as to his intended victim will carry over and determine his culpability when such criminal conduct causes injury to an unintended victim." *Id.* at 609. In essence, the Court sanctioned the application of transferred intent where the crime committed against the intended victim was the same as that committed against the unintended victim.

In *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), the Court disagreed with *Wilson* and refined and narrowed the application of the doctrine of transferred intent. In that case, Ford was charged in a ninety count indictment with, *inter alia,* assault with intent to disable, Md.Code Ann., Art. 27, § 386 (1992 Replacement Volume & 1994 Supp.), for hurling large landscaping rocks at vehicles travelling on a high speed, interstate highway. The trial judge instructed the jury that if it found that Ford assaulted with intent to disable the drivers, this intent could be transferred to the passengers.

The Court of Appeals, however, held that "the application of transferred intent to the crime of assault with intent to disable is ... precluded by the underlying nature of the crime." [8] *Id.* at 710, 625 A.2d 984. The Court explained:

> It is a fundamental tenet of criminal law that a completed crime requires the concurrence of a *mens rea,* a guilty mind, and an *actus reus,* a bad act. The purpose of transferred

---

8. The Court of Appeals also held that transferred intent "does not apply to ... those statutory offenses which require that the defendant's criminal intent be directed towards an actual victim." *Id.* at 709, 625 A.2d 984 (citing *State v. Wilson,* 313 Md. 600, 606 & n. 3, 546 A.2d 1041 (1988)).

intent is to link the mental state directed towards an intended victim, i.e., the intent to kill, maim, or disable that person, with the actual harm caused to another person. In effect, transferred intent makes a whole crime out of two component halves.

*Id.* The Court concluded that the doctrine should only apply when, without transferred intent, "the defendant could not be convicted of the crime at issue because the mental and physical elements do not concur as to either the intended or the actual victim." *Id.* at 711, 625 A.2d 984. "Where the crime intended has actually been committed against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims." *Id.* at 712, 625 A.2d 984 (citing *People v. Birreuta,* 162 Cal.App.3d 454, 208 Cal.Rptr. 635 (1984) (transferred intent not applied where defendant intended to, and did, kill one victim, and also accidentally killed a second unintended victim)).

In so holding, the Court retreated somewhat from its earlier decision in *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988), in which it applied transferred intent to the crime of attempted murder. The Court explained:

We believe *Wilson* should not have applied transferred intent to attempted murder. First, as we have noted, the purpose of transferred intent is not to multiply criminal liability, but to prevent a defendant who has committed all the elements of a crime (albeit not upon the same victim) from escaping responsibility for that crime. If the defendant is charged with attempted murder, shot at but missed the intended victim, the defendant may still be convicted of attempted murder of that victim. The completed crime has been committed on the intended victim, and the fiction of transferred intent would not so much transfer the intent as replicate it and apply it to another victim, thus making multiple specific intent crimes from one single act intended to injure one person.

*Ford,* 330 Md. at 714, 625 A.2d 984 (citations and footnotes omitted).

Appellant apparently [9] seizes upon this language to conclude that transferred intent is not properly applied in *any* case of attempted murder. Appellant, however, misunderstands the purpose of the doctrine of transferred intent, and, as a result, has misinterpreted the Court's holding in *Ford*.

In *Ford*, the Court refused to transfer to the passenger the defendant's intent to assault with intent to disable the driver of the vehicle, thus making two specific intent crimes out of one. *Id.* at 712, 625 A.2d 984. The function of the transferred intent doctrine, explained the Court, is to ensure the adequate punishment of those who fail to complete their crime upon their intended victim, but instead deliver such harm upon an innocent bystander. *Ford*, 330 Md. at 712, 625 A.2d 984. But for the transferred intent doctrine, such people could escape punishment because of their "lucky mistake" or "bad aim." *Id.* Thus, in *Ford*, "[b]ecause the elements of an assault with intent to disable are (1) an assault and (2) an intent to disable, the crime is complete regardless of whether the projectile reaches its target." *Id.* at 713, 625 A.2d 984. There was no need, under the circumstances in that case, for the intent to "follow the bullet" or the rock, as the case may be. *Id.* The Court's holding is illustrated by the following example:

> "If, without justification, excuse or mitigation $D$ with intent to kill $A$ fires a shot which misses $A$ but unexpectedly inflicts a non-fatal injury upon $B$, $D$ is guilty of an attempt to commit murder,—but the attempt was to murder $A$ whom $D$ was trying to kill and not $B$ who was hit quite accidentally. And so far as the criminal law is concerned there is no transfer of this intent from one to the other so as to make $D$ guilty of an attempt to murder $B$."

*Id.* at 715, 625 A.2d 984 (quoting Perkins & Boyce, *Criminal Law* 924–25 (2d ed. 1969)).

---

9. We say "apparently" because appellant supports his contention in his brief with the following succinct, yet vague, assertion: "The inappropriateness of applying transferred intent to a case such as this one is noted in *Ford* [330 Md.] at 708–18 [625 A.2d 984]."

■ This does not mean, as appellant suggests, that the doctrine of transferred intent is not applicable when, as in the case *sub judice*, *D* with intent to kill *A* fires a shot that hits *A*, inflicting upon him a non-fatal injury, but unexpectedly kills *B*. To the contrary, the reasoning of *Ford* supports the application of the doctrine to exactly that situation. *Ford* explained that where the crime committed against the intended victim is as serious as the greatest level of culpability that could be achieved by transferring the intent to the unintended victim, there is no need to transfer intent. *Id.* at 715, 625 A.2d 984 (citing *People v. Calderon,* 232 Cal.App.3d 930, 283 Cal.Rptr. 833, 836 (1991)). It follows, therefore, that where the crime committed against the intended victim is less serious than the greatest level of culpability that could be achieved by transferring the intent to the unintended victim, intent must be transferred, otherwise the greater crime committed against the unintended victim would be inadequately punished. This conclusion is echoed in Judge McAuliffe's concurrence in *Ford,* in which he explained:

> Assume, for example, that the defendant, intending to kill *A,* shoots and wounds him, but the bullet passes through *A* and kills *B.* Under the Court's theory, I assume the defendant would be guilty of the murder of *B,* although also guilty of attempted murder or assault with intent to murder *A.* If *A* had also died, the Court would hold that the defendant could not be convicted of the murder of *B,* but only of battery, or perhaps manslaughter.

*Id.* at 726, 625 A.2d 984 (McAuliffe, J., concurring).

Indeed, under circumstances nearly identical to those in the case *sub judice,* the District of Columbia Court of Appeals, distinguishing *Ford,*[10] held that the doctrine of transferred intent was directly applicable. In *Ruffin v. United States,* 642 A.2d 1288 (D.C.1994), the defendant and four others opened

---

**10.** The court explained that "even if we assume that *Ford* is an authoritative exposition of the common law of transferred intent the decision in *Ford* does not support reversal of appellant's conviction for ... first-degree murder." *Ruffin v. United States,* 642 A.2d 1288, 1294 (D.C. 1994).

fire upon their intended victim, Younger. The ten to fifteen shots they fired wounded Younger, killed Marcia Williams who was driving in the vicinity of the shooting, and wounded one of her children who was riding in the car. The trial court instructed the jury as to transferred intent and they convicted the defendant of, *inter alia,* first degree murder of Marcia Williams and assault with intent to kill while armed on Younger and Williams's son.

On appeal, the defendant argued that the *Ford* case precluded the application of transferred intent to " 'unintended victims of specific intent assaults when the intended victim is actually injured, and when the defendant is prosecuted, convicted, and punished for the harm done to the intended victim.' " *Id.* at 1294. The court of appeals disagreed:

> We reject appellant's contention because it fails to recognize that *Ford*'s reasoning with regard to transferred intent in the context of specific intent assaults is inapplicable here where a defendant fails in his attempt to kill his intended victim but mortally wounds an unintended victim. It is only by pairing appellant's premeditated and deliberate intent to kill Younger with the actual harm (death) caused to Marcia Williams that the proper punishment can be imposed on appellant under the circumstances of this case. Thus, appellant's reliance upon *Ford* is misplaced insofar as he argues *Ford* requires vacating his first-degree murder conviction.

*Id.* at 1295. *See also Provenzano v. State,* 497 So.2d 1177 (Fla.) (transferred intent properly applied where defendant wounded two intended victims, but killed unintended victim), *cert. denied,* 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987).

The reasoning in *Ruffin,* and Judge McAuliffe's hypothetical in *Ford,* are directly applicable to the case *sub judice.* Appellant fired his shotgun at Ms. Poe intending to kill her. Although he only wounded Ms. Poe, the projectile struck and killed Kimberly Rice. If appellant's intent to kill Ms. Poe is not paired with the actual harm caused to Kimberly Rice, the

death of Ms. Rice would be inadequately punished. Therefore, we hold that the trial judge properly applied the doctrine of transferred intent in instructing the jury.

### III. & IV.

Appellant next argues that the trial judge improperly instructed the jury as to murder, attempted murder, and reasonable doubt. As appellant failed to object on the record promptly after the court instructed the jury as to each of the foregoing instructions, these issues are not preserved for our review. Md.Rule 4–325; *Richmond v. State,* 330 Md. 223, 235, 623 A.2d 630 (1993); *Austin v. State,* 90 Md.App. 254, 257, 600 A.2d 1142 (1992). Although Rule 4–325 allows us, in our discretion, to take cognizance of any plain error in the instructions, we discern no plain error in the instructions given regarding murder, attempted murder, or reasonable doubt.

### V.

Appellant also contends that the circuit court improperly instructed the jury as to the substantive evidence value of a prior inconsistent statement made by Ms. Poe to Trooper Gawrych. Appellant suggests that the circuit court was required "to explain to the jury exactly that which had substantive value as evidence to determine guilt, and that which was of value only to use to impeach the credibility of the witness who made the inconsistent statements." The State, however, argues that the circuit court properly instructed the jury that Ms. Poe's "first statement to the police was the only one that could be used as substantive evidence, since she agreed that she had made the statement, but that any other statements had only impeachment value."

The law governing the use of prior inconsistent statements as substantive evidence was set forth in *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993). Prior to *Nance,* Maryland had been "one of only a handful of states to adhere to the orthodox rule barring use of prior inconsistent statements as substan-

tive evidence." *Id.* at 565, 629 A.2d 633. As explained in *Sheppard v. State*, 102 Md.App. 571, 650 A.2d 1362 (1994):

> If a trial witness had earlier given a statement inconsistent with the witness's later trial testimony, the prior statement was admissible only for the limited purpose of impeaching that witness's testimonial credibility. The jury was instructed to use the prior statement only for that purpose and not to consider its content for the truth of the matter asserted therein. In that capacity, a prior inconsistent statement was non-hearsay, offered only for the fact that the earlier inconsistent words had been uttered, the truth of the words being immaterial.

*Id.* 102 Md.App. at 572, 650 A.2d at 1363.

■ In *Nance*, the Court of Appeals adopted a moderated version of the so-called "modern rule" regarding prior inconsistent statements. The Court held that the factual portion of an inconsistent out-of-court statement may be offered as substantive evidence of guilt when the statement (1) is based on the declarant's own knowledge of the facts, (2) is reduced to writing and signed or otherwise adopted by him, and (3) he is subject to cross-examination at the trial where the prior statement is introduced. *Nance*, 331 Md. at 569, 629 A.2d 633 (footnote omitted).[11]

■ In the case *sub judice*, the trial judge instructed the jury as follows:

> Now in this case you had some prior statements which may have been, maybe, inconsistent. A witness may be

---

11. Although not applicable to the instant case, this evidentiary principle is now set out in Maryland Rule 5–802.1. It provides in pertinent part:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> (a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement. . . .

discredited on a material fact in his or her statement by evidence showing he had given—he or she has given a prior statement on this material fact, which is inconsistent with the present testimony to be given on the stand. Proof of these considerations—inconsistent statement, only talking about that aspect—is not to be considered evidence of any substantive facts. It is solely for the purposes of aiding you in making an evaluation of the credibility of the witness. How does it affect this witness' testimony in court. Do you believe that witness or not because of it.

At this point in the instruction, counsel for appellant interjected that the court must consider the *Nance* case. The trial judge responded with the following addendum to his instruction:

Well, on some of the statements where a person changed them, and they go to the merits of the case, that is substantive evidence, but most of these are inconsistent. That would be, perhaps, the first statement that Karen Poe gave. That's the only one, first statement. That's a part of the evidence, first statement. The rest of them were impeaching—for impeachment.

Counsel for appellant noted his objection.

It is clear that the trial judge did exactly what was required of him under *Nance.* The only prior inconsistent statement he determined could be considered as substantive evidence was the first statement made by Ms. Poe to Trooper Gawrych on 8 September 1993. There, Ms. Poe recounted the following facts: appellant had threatened to kill her and Duane Rice if she would not let him move back in with her; on the day of the shooting, she refused to allow appellant to take the children because he appeared to be on drugs; she heard appellant state "Take this," or "Eat this, bitch," before firing his shotgun. At trial, however, Ms. Poe testified that her statement to Trooper Gawrych was based on information provided to her by Biggs and Sponseller, who, according to Ms. Poe, had lied to her. On cross-examination, she further

attempted to explain the discrepancies between her prior statement and her present testimony.[12]

Ms. Poe's prior inconsistent statement to Trooper Gawrych meets all the criteria set forth in *Nance:* it was based on the declarant's own knowledge of the facts; it was reduced to writing by Trooper Gawrych; it was adopted by Ms. Poe when she admitted at trial to making the statement; and Ms. Poe was subject to cross-examination at the trial where the prior inconsistent statement was introduced. Consequently, we hold that the circuit court did not err in instructing the jury that it could consider Ms. Poe's prior inconsistent statement to Trooper Gawrych as substantive evidence of appellant's guilt.

## VI.

Finally, appellant contends that the trial judge, motivated by ill-will, prejudice, or other impermissible considerations, imposed an improper sentence. Specifically, appellant argues that the trial judge "invoked his personal religious beliefs . . . [and] put himself at odds with what he termed 'this liberal philosophy.'"[13]

▮▮▮ "[A] sentencing judge in a criminal proceeding is 'vested with virtually boundless discretion,'" and "is accorded this broad latitude to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation." *State v. Dopkowski,* 325 Md. 671, 679, 602 A.2d 1185 (1992) (quoting

---

12. The State suggested in closing argument that Ms. Poe may have changed her testimony at trial because she reconciled with appellant after the incident. To the extent there was evidence to support this theory, it was that Ms. Poe testified that she visited appellant in jail thirteen to fourteen times between the shooting in August 1993 and the trial in January 1994, including taking the children to see him every Saturday.

13. Appellant suggests that, although "no objection was made to the remarks or to the sentencing by appellant's trial counsel," this Court should review the error because it "does cause a substantial injustice." As explained in *Walczak v. State,* 302 Md. 422, 427, 488 A.2d 949 (1985), however, "when the trial court has allegedly imposed a sentence not permitted by law, the issue should ordinarily be reviewed on direct appeal even if no objection was made in the trial court." We oblige.

*Logan v. State*, 289 Md. 460, 480, 425 A.2d 632 (1991)). A proper sentence is determined from the facts and circumstances of the crime and the background of the defendant. *Id.* Appellate review of a criminal sentence is therefore limited to three recognized grounds: (1) the sentence may not constitute cruel and unusual punishment or otherwise violate constitutional requirements; (2) the sentencing judge may not be motivated by ill-will, prejudice, or other impermissible considerations; and (3) the sentence must be within the statutory limitations if there are any. *Id.* at 680, 602 A.2d 1185 (citing *Teasley v. State*, 298 Md. 364, 370, 470 A.2d 337 (1984)).

■ In the instant case, the trial judge received several letters written on behalf of appellant. In addition, several witnesses testified on behalf of appellant. Appellant was also given an opportunity to address the court. He explained that the shooting was an accident and expressed remorse over the death of Kimberly Rice. Finally, the trial judge heard testimony from Kimberly Rice's mother and grandmother, who both described the losses they had suffered as a result of Kimberly's death.

The trial judge then acknowledged the testimony received on behalf of appellant and on behalf of Kimberly Rice; recognized that appellant had no prior criminal record; and "crossed swords" with appellant concerning his testimony that the shooting was an accident. The court then pointed out the gravity of an offense involving the killing of an innocent child, and the effect the killing had on Kimberly Rice's brother, Jason, and appellant's own children. The court then explained:

> That's what irritates me today with this liberal philosophy. I guess I'm a dinosaur. I'm still old-fashioned. Maybe my time is gone, maybe. I still believe in good old-fashioned law and order, the Bible, and a lot of things that people say I shouldn't believe in anymore. Perhaps I am a dinosaur sitting here, but I'm not going to change. Maybe one day they will say you should not sit here any more because you are too much of dinosaur. You are too conser-

vative in criminal law. You believe too much in the Bible and law and order.

Well, that day will have to come from somebody's hands other than mine, because I'm going to do the best I can to do things which I think are morally right. I know morals aren't around here anymore. It's irritating that a liberal philosophy prevails. Nobody should be punished. Let everybody walk the streets. Nobody is guilty of any crimes. They're either sick or drunk or scared.

Like I said I'm probably a dinosaur in this day and age, but I'm proud to be one, and let the liberal thinking overwhelm everyone else. It's not going to overwhelm me. It may interfere with me, but it won't overwhelm me. I am struck [sic] with some decisions and laws I can't do anything about, unfortunately.

Appellant was subsequently sentenced to life imprisonment without parole for the murder count and thirty years consecutive for the attempted murder count.

Notwithstanding the trial judge's comments concerning his personal moral and religious beliefs, we hold that the life without parole plus thirty year sentence was not motivated by ill-will, prejudice, or other impermissible considerations, and was lawfully imposed within statutory limits. It is clear from the record before us that the trial judge considered the facts and circumstances of the crime and the background of appellant in exercising his sentencing discretion. We acknowledge, however, that it is a better practice for trial judges not to raise the specter that their sentences are motivated by, or grounded upon, their personal sociological or religious convictions, lest an otherwise sustainable sentence be called into question on appeal.

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.