671 A.2d 501

**James Allen POE**

v.

**STATE of Maryland.**

**No. 52, Sept. Term, 1995.**

Court of Appeals of Maryland.

Feb. 9, 1996.

Raker, J., concurred in judgment and filed opinion joined by Rodowsky and Karwacki, JJ.

524

M. Gordon Tayback, Baltimore, for Petitioner.

Annabelle L. Lisic, Assistant Attorney General, (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

The primary issue we are called upon to determine in this case is whether the doctrine of transferred intent applies when a defendant, intending to kill one person, shoots and wounds that person, but the shot passes through the intended victim and kills an unintended victim. We are also asked to decide whether the trial court properly sentenced Petitioner. For the reasons set forth below, we find that the trial court properly applied the doctrine of transferred intent in the instant case, and find no error in Petitioner's sentence. Accordingly, we uphold Petitioner's conviction and affirm the Court of Special Appeals.

I.

Petitioner James Allen Poe (Mr. Poe or the defendant) was charged in the Circuit Court for Cecil County with first degree murder of Kimberly Rice (Kimberly), an innocent bystander, and first degree attempted murder of his intended victim Karen Poe (Ms. Poe), his estranged wife. The defendant was convicted by a jury before the Honorable Donaldson C. Cole, Jr. of the foregoing charges.

On August 10, 1993, Mr. Poe drove to the home of Ms. Poe in order to visit with their four children. Although there was no formal visitation agreement, Ms. Poe generally allowed Mr. Poe to visit with the children whenever he wanted. On that

day, however, Ms. Poe heard that Mr. Poe planned to take the children to Florida with his new girlfriend and refused to allow Mr. Poe to take the children. An argument ensued in front of the house. Two adults and eight children were present at the time: Donna Biggs, Ms. Poe's half sister; Biggs's boyfriend, Michael Sponseller; the Poe's four children; two children of Ms. Poe's boyfriend; and two children of Ms. Poe's sister, Virginia Sorrell.

According to the testimony of adults who witnessed the argument, Ms. Poe announced that she was going to call the police. She walked into the house, called 911 and asked the police to come to the house to remove Mr. Poe from the premises. Testimony at trial revealed that as Ms. Poe walked into the house, Mr. Poe walked toward the trunk of his car. Ms. Poe, Donna Biggs, and Michael Sponseller all observed Mr. Poe open the trunk of his car and remove a 12–gauge shotgun. Michael Sponseller testified that Ms. Poe yelled from inside the house, " 'I don't have to take this anymore.' " Several witnesses testified that at that moment, Mr. Poe pointed his shotgun toward the door and shouted, " 'Take this, bitch'."

At least one shot was fired into the house, hitting both Ms. Poe and Kimberly, the six year old daughter of Ms. Poe's boyfriend, who was apparently standing behind Ms. Poe. The 50 caliber lead slug passed through the front screen door, Ms. Poe's arm, Kimberly's head, and out the wooden back door. The single shot inflicted a nonfatal wound in Ms. Poe, but killed Kimberly instantly.

Michael Sponseller called 911, and gave Mr. Poe's name and a description of his car to the police as he watched the defendant drive away from the scene. Mr. Poe threw the shotgun out of the car window to the side of the road nearby and drove toward Pennsylvania. He was stopped by the Pennsylvania State Police in Chester County, Pennsylvania based on a bulletin given over a police radio broadcast describing Mr. Poe's car. As he was handcuffed, Mr. Poe blurted out that what he had done was an accident and that he loved kids.

While being transported to the police barracks nearby, Mr. Poe blurted out that he " 'was holding the gun in the air and the gun went off.' "

At the close of all the evidence at trial, Judge Cole instructed the jury on the doctrine of transferred intent as it applied to the homicide of Kimberly. Judge Cole explained to the jury that if they believed that the defendant willfully, deliberately and with premeditation intended to kill Ms. Poe, then they could find Mr. Poe guilty of first degree murder of Kimberly. In other words, if the jury would have convicted Mr. Poe of first degree murder of Ms. Poe had she died as a result of the shot, they could convict Mr. Poe of first degree murder of Kimberly, because the intent to kill Ms. Poe transfers to Kimberly, the unintended victim. The jury found the defendant guilty of first degree murder of Kimberly and guilty of attempted first degree murder of Ms. Poe.

At the defendant's sentencing hearing, Judge Cole heard statements from the defendant, members of his family, and members of Kimberly's family, in addition to reading several letters on behalf of the defendant. The trial judge weighed the evidence, the testimony, the seriousness of the crimes, the impact they had upon the families, and the fact that Mr. Poe had no prior criminal record. The judge also made reference to his belief in "good old-fashioned law and order [and] the Bible." The judge then sentenced Mr. Poe to a term of life imprisonment without the possibility of parole for the murder of Kimberly and a consecutive 30–year sentence for the attempted murder of his estranged wife.

Mr. Poe's convictions were affirmed by the Court of Special Appeals. *Poe v. State*, 103 Md.App. 136, 652 A.2d 1164 (1994). We granted certiorari to consider the appropriateness of the trial court's instructions on the doctrine of transferred intent and the trial judge's reference to the Bible in sentencing the defendant.

## II.

The trial court instructed the jury on the doctrine of transferred intent in pertinent part as follows:

"If I intend to kill . . . Karen in this case, and my mark's not good, or bullet goes through, and I kill somebody else, and they die instead of Karen, that's still first degree murder on the second one because the law does not protect a person who has a bad aim or is unfortunate enough to have the bullet go through the first. That is called transferred intent. The intent follows the bullet."

Mr. Poe contends on appeal that the lower courts erred in ruling that the doctrine of transferred intent applies where a defendant intends to kill A, shoots and wounds A, but kills B, an unintended victim, by that same shot.[1] Essentially, Mr. Poe argues that because he intended to and did shoot Ms. Poe and was convicted of her attempted murder, there is no intent left to transfer to Kimberly, the unintended victim. The defendant contends that he "used up" all of his intent on Ms. Poe, his targeted victim. In his brief Mr. Poe states:

"[W]hat is clear is that the [defendant] was charged with, and convicted of, attempted murder (first degree) of Karen Poe. The crime of attempted murder was complete.

As the State presented the evidence against the [defendant], and as the jury so found in its decision, the [defendant] deliberately, with premeditation, intended to kill his wife when he fired a shotgun shell at her. Indeed, the shell *did* hit her; she was lucky to have survived. The same *mens rea* was involved whether Karen Poe lived or died. The [defendant] had accomplished the intended physical result of shooting his wife. * * * There was *no* intent left to transfer from Karen Poe to Kimberly Rice."

We do not agree. The defendant is correct that "the crime of attempted murder [of Ms. Poe] was complete" when he fired the shotgun at her. The defendant fails to recognize, however, that his intent was to murder, not to attempt to murder. Since Mr. Poe killed Kimberly, his intent to murder was "transferred" from Ms. Poe to Kimberly. We agree with

---

1. We note that the defendant argues only that his conviction for the first degree murder of Kimberly should be reversed. He has not asked this Court to vacate his sentence for the attempted murder of Ms. Poe.

the State that the passing of the bullet through the arm of the intended victim before killing the unintended victim does not alter or negate the application of the doctrine of transferred intent. *A fortiori*, this is a classic case of transferred intent.

In *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993), our most recent case interpreting the doctrine of transferred intent, we said that transferred intent links a defendant's *mens rea* as to the intended victim, with the killing of an unintended victim, and, in effect, "makes a whole crime out of two component halves." 330 Md. at 710, 625 A.2d at 997. The obvious purpose behind this doctrine is to prevent a defendant from escaping liability for a murder in which every element has been committed, but there is an unintended victim. *See Ford*, 330 Md. at 714, 625 A.2d at 999.

We stated in *Ford* that transferred intent does not apply to attempted murder. *Id.* (disapproving application of the doctrine of transferred intent to attempted murder in *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988)). The doctrine of transferred intent is, of course, pure legal fiction. 1 WAYNE R. LaFAVE AND AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 3.12(d), at 399 (2d ed.1986). It is analogous to the doctrine of felony murder which is also a legal fiction. Both doctrines are used to impose criminal liability for unintended deaths. *See Gladden v. State*, 273 Md. 383, 404, 330 A.2d 176, 188 (1974) ("In homicide cases . . . the doctrine of 'transferred intent' performs a function equivalent to that applied under the felony-murder rule." (Footnote omitted)). Clearly, there is no crime of attempted felony murder when no death occurs during the course of a felony. *Bruce v. State*, 317 Md. 642, 646–47, 566 A.2d 103, 105 (1989). Likewise, the doctrine of transferred intent does not apply to attempted murder when there is no death.

Petitioner tries to unduly stretch our holding in *Ford* that the doctrine of transferred intent is inapplicable to attempted murder. We reject Poe's argument that because he completed the crime of attempted murder of his intended victim, the doctrine of transferred intent does not apply to the death of

another person.  In *Ford,* we made clear that if a defendant intends to kill a specific victim and instead wounds an unintended victim *without killing either,* the defendant can be convicted only of the attempted murder of the *intended* victim and transferred intent does not apply.[2]  330 Md. at 714, 625 A.2d at 999.  This is not true where, as in the case *sub judice,* the defendant intends to murder one victim and instead kills an unintended victim.  Here, transferred intent applies because there is a death and the doctrine is necessary to impose criminal liability for the murder of the unintended victim in addition to the attempted murder of the intended victim.  *See Ruffin v. United States,* 642 A.2d 1288, 1294–95 (D.C.App. 1994) (discussing *Ford* and upholding the conviction of defendant for first degree murder of unintended victim under the doctrine of transferred intent where defendant only wounded intended victim).  In *Ford,* this Court asserted that the doctrine is used when the defendant fails to commit the crime intended upon the targeted victim and completes it upon another.  330 Md. at 711, 625 A.2d at 998.  Thus, the doctrine should be applied to the instant case.

■  The doctrine of transferred intent is typically applied where a defendant, intending to kill A, shoots at but *misses* A and instead kills B, an unintended victim.  *See Gladden,* 273 Md. at 390–92, 330 A.2d at 180–81, and cases cited therein. Mr. Poe asserts that his intent to murder cannot be transferred when the shot *hits* the intended victim and also kills an unintended victim.  Mr. Poe's interpretation of the application of transferred intent is too narrow.  We hold that transferred intent applies to the death of Kimberly notwithstanding the fact that Mr. Poe actually hit and wounded Ms. Poe.[3]  The

---

**2.** The rationale is that the crime of attempted murder of the intended victim is complete regardless of whether he hits his target and thus, there is no need to invoke the doctrine. *Ford v. State,* 330 Md. 682, 714 n. 13, 625 A.2d 984, 999 n. 13 (1993) ("the crime is complete before the projectile reaches its target").

**3.** Judge McAuliffe foresaw this precise scenario in his concurrence in *Ford* and anticipated the holding we reach today in the instant case:

relevant inquiry in determining the applicability of transferred intent is limited to what could the defendant have been convicted of had he accomplished his intended act? *See Gladden*, 273 Md. at 393, 330 A.2d at 181. Since Mr. Poe could have been convicted of first degree murder of Ms. Poe had she died, it was proper for the trial court to instruct the jury on the doctrine of transferred intent for the killing of Kimberly.[4]

## III.

■ The defendant's second contention is that the trial judge sentenced him based upon the judge's "own personal religious or moral standard, and in spite of any evidence to mitigate punishment." Although the trial judge made statements regarding his own moral and religious beliefs, he also properly considered all mitigating factors and imposed a sentence that was well within the scope of the trial judge's authority. Accordingly, we find no error in Mr. Poe's sentence.

■ A judge is vested with very broad discretion in sentencing criminal defendants, *Logan v. State*, 289 Md. 460, 480, 425 A.2d 632, 642 (1981), and "is accorded this broad latitude to best accomplish the objectives of sentencing—punishment, deterrence, and rehabilitation." *State v. Dopkowski*, 325 Md. 671, 679, 602 A.2d 1185, 1189 (1992). *Accord*

---

"Assume, for example, that the defendant, intending to kill *A*, shoots and wounds him, but the bullet passes through *A* and kills *B*. Under the Court's theory, I assume the defendant would be guilty of the murder of *B*, although also guilty of attempted murder or assault with intent to murder *A*."

*Ford*, 330 Md. at 726, 625 A.2d at 1005 (McAuliffe, J., concurring).

4. Judge Raker writes separately to explain why she agrees with the concurring opinion in *Ford*, 330 Md. at 723, 625 A.2d at 1004. In *Ford*, we stated that the doctrine of transferred intent was inapplicable to the offense of attempted murder where there is no death. In the instant case, we hold that the doctrine of transferred intent is applicable to the offense of murder where there is an unintended death. The only reason why *Ford* is discussed is to explain why the defendant's reliance on that case is misplaced and why *Ford* is inapposite to the instant case.

*Jones v. State,* 336 Md. 255, 265, 647 A.2d 1204, 1209 (1994). A judge should fashion a sentence based upon the facts and circumstances of the crime committed and the background of the defendant, *Dopkowski,* 325 Md. at 679, 602 A.2d at 1189, including his or her reputation, prior offenses, health, habits, mental and moral propensities, and social background. *Bartholomey v. State,* 267 Md. 175, 193, 297 A.2d 696, 706 (1972). As we explained in *Johnson v. State,* 274 Md. 536, 336 A.2d 113 (1975), a trial judge may base the sentence on "perceptions . . . derived from the evidence presented at the trial, the demeanor and veracity of the defendant gleaned from his various court appearances, as well as the data acquired from such other sources as the presentence investigation or any personal knowledge the judge may have gained from living in the same community as the offender." 274 Md. at 540, 336 A.2d at 115–16 (footnotes omitted). A trial judge's discretion is limited only by constitutional standards and statutory limits. The ultimate determination must not be motivated by ill-will, prejudice, or other impermissible considerations. *Dopkowski,* 325 Md. at 680, 602 A.2d at 1189; *Teasley v. State,* 298 Md. 364, 370, 470 A.2d 337, 340 (1984).

At the sentencing hearing in the instant case, Judge Cole heard testimony from the defendant's father, two of his aunts, his girlfriend Doreen Jester, Ms. Poe, and Mr. Poe himself regarding Mr. Poe's good character and non-violent nature. The judge also read letters from members of Mr. Poe's family asking Judge Cole to be lenient in sentencing Mr. Poe, and stating that he felt deep remorse for what had happened. Judge Cole then heard testimony from Kimberly's mother and grandmother who described how the loss of this young child has affected their lives. In addition, the trial judge considered the evidence adduced at trial, the witnesses who testified at trial, and the defendant's lack of a prior criminal record in order to aid him in formulating Mr. Poe's sentence. The judge then stated that he did not believe the defendant's contention that the shooting was an accident, and noted the gravity of the offense of killing an innocent child. Based upon all of the evidence before him, the judge believed that Mr.

Poe's intent was to kill his wife and that he deliberately and with premeditation fired the shotgun at her. Finally, before announcing the sentence to be imposed on Mr. Poe, the trial judge remarked:

> "That's what irritates me today with this liberal philosophy. I guess I'm a dinosaur. I'm still old-fashioned. Maybe my time is gone, maybe. I still believe in good old-fashioned law and order, the Bible, and a lot of things that people say I shouldn't believe anymore. Perhaps I am a dinosaur sitting here, but I'm not going to change. Maybe one day they will say you should not sit here any more because you are too much of a dinosaur. You are too conservative in criminal law. You believe too much in the Bible and law and order."

The trial judge found no mitigating factors that outweighed Mr. Poe's egregious act and sentenced the defendant to life without the possibility of parole for the murder of Kimberly and a consecutive 30–year sentence for the attempted murder of Ms. Poe.

In *U.S. v. Bakker*, 925 F.2d 728 (4th Cir.1991), the Fourth Circuit held that the sentencing judge improperly asserted his own personal religious beliefs in sentencing the well-known televangelist James Bakker. That judge stated: " 'He had no thought whatever about his victims and those of us who do have a religion are ridiculed as being saps from money-grubbing preachers or priests.' " *Bakker*, 925 F.2d at 740 (emphasis omitted). The court remanded to the district court for resentencing because it believed that the sentence imposed "may have reflected the fact that the court's own sense of religious propriety had somehow been betrayed." *Bakker*, 925 F.2d at 741. Although the court found an "explicit intrusion of personal religious principles as the basis of a sentencing decision," the court also recognized "that a trial judge on occasion will misspeak during sentencing and that every ill-advised word will not be the basis for reversible error." *Id.* We do not believe the remarks made in the instant case were as extreme as those made in *Bakker*, nor do we believe that Judge Cole's comments reflected that his personal religious

beliefs had been betrayed. *See Gordon v. State*, 639 A.2d 56 (R.I.1994) (holding that biblical reference by sentencing judge did not suggest bias). Reversal is therefore not warranted in the instant case.

In recognizing a trial judge's very broad discretion in sentencing, we by no means express approval of the remarks made by Judge Cole pertaining to his own personal religious and moral beliefs. Nonetheless, we find that the sentence imposed upon the defendant was not motivated by ill-will, prejudice, or other impermissible considerations. Because we believe that the trial judge acted within the limits of his broad discretionary powers in sentencing Mr. Poe, we find no abuse of discretion.

For the reasons indicated, we hold that the doctrine of transferred intent was properly applied to the instant case and the trial judge properly sentenced the defendant.

*JUDGMENT AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

RAKER, Judge, concurring.

I concur in the judgment of the Court and in the majority's conclusion that the doctrine of transferred intent applies to the death of Kimberly notwithstanding the fact that James actually hit and wounded Karen. I write separately to make clear what I believe the Court is *not* holding.

I do not believe that the Court intends, by today's decision, to endow the dicta in Part II.C of its opinion in *Ford v. State*, 330 Md. 682, 708–18, 625 A.2d 984, 996–1001 (1993), with the binding effect of a holding. The central issue in *Ford* was whether the evidence was sufficient for a jury to find the defendant possessed the specific intent to disable required for a conviction of assault with intent to disable. We concluded that the evidence was sufficient to affirm the conviction. The doctrine of transferred intent arose only as "a somewhat collateral issue," *id.* at 708, 625 A.2d at 1001, merely providing an alternative basis for affirming the conviction. *See Ruffin v.*

*United States,* 642 A.2d 1288, 1293 (D.C.1994).[1] Although *Ford* questioned the rationale for our decision in *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988), which recognized application of the transferred intent doctrine to attempted murder, *Ford* did not, and could not in dicta, overrule *Wilson.*[2]

I believe the majority's assertion that "the doctrine of transferred intent does not apply to attempted murder when there is no death," maj. op. at 529, is overly broad. I do not interpret *Ford* to preclude all applications of transferred intent to the offense of attempted murder. Reading the language in *Ford* together with our holding in *Wilson,* I believe the correct interpretation is that transferred intent should not apply to attempted murder if no one is injured. *See Harrod v. State,* 65 Md.App. 128, 137, 499 A.2d 959, 963 (1985); *see also State v. Martin,* 342 Mo. 1089, 119 S.W.2d 298, 302 (1938); *but see State v. Gillette,* 102 N.M. 695, 699 P.2d 626 (Ct.App.1985) (applying transferred intent to attempted murder where no one was injured).

The majority attempts to bolster its narrow interpretation of the doctrine of transferred intent by drawing an analogy between transferred intent and felony murder. Maj. op. at 529. The majority maintains that transferred intent and felony murder are essentially equivalent because they serve the same purpose, i.e., "to impose criminal liability for unintended deaths." *Id.* Next, the majority asserts, correctly, that felony murder is inapplicable if no death results. *Id.*

---

**1.** Judge McAuliffe's concurring opinion in *Ford* (joined by Judges Karwacki and Rodowsky) described the Court's "newly announced limitation on the doctrine of transferred intent" as dictum. 330 Md. at 726, 625 A.2d at 1005. *Cf. Brooks v. United States,* 655 A.2d 844, 846-47 & n. 7 (D.C.1995) (status of *Wilson* unclear in light of subsequent cases).

**2.** Three years before *Ford* was decided, in *State v. Earp,* 319 Md. 156, 571 A.2d 1227 (1990), we relied on *Wilson* for the proposition that "[t]he specific intent that is required [for attempted murder] may be a 'transferred' intent, that is, the *mens rea* of a defendant as to his intended victim will be transferred to an unintended victim who suffers injury as a result of the defendant's attempt." *Id.* at 163, 571 A.2d at 1231.

The majority therefore concludes that transferred intent is also inapplicable when no death results. *Id.*

Although this argument appears unassailable, it is unsound because it depends on a false premise. Therefore, while the deductive logic of the argument is valid, it leads to a false conclusion. The argument is based on the proposition that transferred intent and felony murder are interchangeable doctrines. On the contrary, although transferred intent and felony murder serve *similar* purposes in homicide cases, the doctrines are *not* interchangeable. *See People v. Carlson*, 37 Cal.App.3d 349, 112 Cal.Rptr. 321, 323–24 (1 Dist.1974); *see also* R. Perkins & R. Boyce, *Criminal Law* 922–24 (3d ed.1982). Transferred intent can only function to "shift" the defendant's intent from one object to another, while felony murder may be used to imply an intent from the defendant's act of committing a felony. *See infra* note 3; *see also Carlson*, 112 Cal.Rptr. at 323–24 ("the effect of the felony-murder rule is to withdraw from the trier of fact the issue of malice and thus relieve the trier of fact from the necessity of finding one of the elements of the crime of murder."). Therefore, it does not follow that transferred intent is subject to the same limitations as felony murder.

Furthermore, neither history nor policy supports the majority's limitation of transferred intent to cases resulting in death. Both English and American common law support applying the doctrine of transferred intent to situations where innocent third parties are non-fatally injured. In *State v. Thomas*, 127 La. 576, 53 So. 868 (1911), the Supreme Court of Louisiana traced the English common law history of the doctrine of transferred intent, citing a number of English cases that held transferred intent applied when bystanders received non-fatal injuries. *Id.* 53 So. at 871. The *Thomas* court quoted an opinion by Lord Coleridge, *Regina v. Latimer*, 17 Q.B.D. 359 (1886), which stated:

> It is common knowledge that a man who has an unlawful and malicious intent against another, and, in attempting to carry it out, *injures* a third person, is guilty of what the law deems malice against the person injured, because the of-

fender is doing an unlawful act, and has that which the judges call general malice, and that is enough.

53 So. at 871 (emphasis added) [3]; *see also* W. Clark & W. Marshall, *A Treatise on the Law of Crimes* § 5.04, at 274–75 (M. Barnes ed., 7th ed.1967). Based on a thorough review of the English law, the *Thomas* court concluded that the majority of cases permitted transferred intent to be applied in cases where no death resulted. 53 So. at 871.

Historically, American courts, following the English precedents, have also applied the doctrine of transferred intent to cases where a third party was injured but not killed. *See, e.g., Thomas,* 53 So. 868; *McGehee v. State,* 62 Miss. 772, 52 Am.Rep. 209 (1885); *State v. Gilman,* 69 Me. 163, 31 Am.Rep. 257 (1879). For example, in *State v. Gilman,* 69 Me. 163, 31 Am.Rep. 257 (1879), the Supreme Court of Maine was asked to determine whether the doctrine of transferred intent could be applied to the offense of assault with intent to kill. The defendant, Gilman, shot into a crowd intending to kill Noyes, but instead wounded a bystander, Flood. Relying on the seminal English case of *Regina v. Smith,* Dears C.C. 559

---

**3.** Lord Coleridge also noted in *Latimer* that "but for *Regina v. Pembliton,* there would not have been the slightest difficulty" in deciding the transferred intent issue. *Thomas,* 53 So. at 871 (quoting *Regina v. Latimer,* 17 Q.B.D. 359 (1886)). He distinguished *Pembliton,* 2 L.R., C.C.R. 119, [1874–1880] All E.R.Rep. 1163 (1874), because it involved not only a transfer of intent from one victim to another, but also a change in the nature of the intent. *Thomas,* 53 So. at 871 (citing *Regina v. Latimer,* 17 Q.B.D. 359 (1886)). In *Pembliton,* the defendant threw a rock at people standing in the street, but missed them and broke a window. [1874–1880] All E.R.Rep. at 1164. The court held that transferred intent could not be applied to the offense of unlawful and malicious property damage because the defendant never intended to damage property. *Id.* at 1163.

Perkins and Boyce similarly distinguish between transfers of intent involving the "same mental pattern," *i.e.,* where only the object of the intent is shifted, and transfers of intent involving a "different mental pattern," *i.e.,* where the crime intended differs from the crime committed. Perkins & Boyce, *supra,* at 922–23. Only the first category can accurately be described as "transferred intent." In mathematical terms, transferred intent may be used to effect a "translation" of intent, but not a "transformation." *See* D. Riddle, *Calculus and Analytic Geometry* 261 (3d ed. 1979).

**538**

(1855), the court held that transferred intent applied, and affirmed Gilman's conviction of assault with intent to kill Flood. *See also McGehee*, 52 Am.Rep. at 210.

More recently, the District of Columbia Court of Appeals also concluded that the doctrine of transferred intent applied to the offense of assault with intent to kill. *Ruffin v. United States*, 642 A.2d 1288 (D.C.1994). In reaching this conclusion, the court relied in part on our decisions in *Ford* and *Wilson*.[4] In *Ruffin*, the defendant participated in a drive-by shooting on a public street, which resulted in a non-fatal injury to the intended victim (Younger), a fatal injury to one bystander (Williams), and a non-fatal injury to another bystander (Walker). The defendant was convicted of assault with intent to kill Younger and, applying transferred intent, first-degree murder of Williams and assault with intent to kill Walker. The defendant argued, based on *Ford*, that he could not be convicted of assault with intent to kill Walker because he had completed the crime of assault with intent to kill against his intended victim, Younger. The court rejected this view, explaining:

> [E]ven if we adopted the reasoning in *Ford* for the purpose of determining this appeal, we would not reverse appellant's conviction for AWIKWA [assault with intent to kill while armed] against Dwayne Walker. This is because the *Ford* court does *not* abandon the result it reached in *Wilson, supra*, (upholding convictions for attempted murder vis-a-vis the intended victim *and* the injured bystander), but rather provides that ... a defendant can be convicted of murder or assault with intent to kill of bystander victims even where the defendant has been convicted of murder or assault with intent to kill against the intended victim ... '[w]here the

---

4. By statute, the District of Columbia has adopted the common law of Maryland as it existed in 1801. *Ruffin*, 642 A.2d at 1294, n. 9. The court in *Ruffin* did not address the issue of whether case law subsequent to 1801 also has binding effect under the statute, but the District of Columbia relied on our decision in *Gladden v. State*, 273 Md. 383, 330 A.2d 176 (1974), in adopting the doctrine of transferred intent. 642 A.2d at 1293 n. 8.

means employed to commit the crime against a primary victim [*e.g.,* a hail of gunfire] creates a zone of harm around that victim.'

642 A.2d at 1298. Thus, the court concluded that although neither the intended victim nor the unintended victim was killed, transferred intent could be applied to permit conviction for assault with intent to kill the unintended victim. *Id.* at 1293 n. 8.[5]

In addition, the policy rationale for the doctrine of transferred intent is to ensure proportionate punishment of criminal offenses, and to prevent criminals from escaping culpability due to "poor aim" or mistaken identity. *See, e.g., People v. Birreuta,* 162 Cal.App.3d 454, 208 Cal.Rptr. 635, 639 (5 Dist. 1984). This rationale supports application of the doctrine regardless of whether the resulting injury to a bystander is fatal or non-fatal.

If the majority's opinion is interpreted to preclude any use of the doctrine of transferred intent in attempted murder prosecutions, the effect of the decision will be to substantially increase the difficulty of prosecuting criminals for the harm inflicted on innocent bystanders. For example, consider a hypothetical drive-by shooting similar to the incident in *Ruffin:* a defendant, A, participates in a drive-by shooting on a public street, intending to kill B, but instead non-fatally injuring B, and non-fatally injuring bystander C. Although A may be convicted of attempted murder of B, it will be difficult to convict A of the attempted murder of C, or of assault with intent to kill C. Without transferred intent, the State will be required to offer separate proof of intent for each victim, e.g., by demonstrating "depraved heart." While firing a "hail of bullets" at a person on a busy street may be *prima facie* evidence of a depraved heart, numerous factual situations may

---

**5.** The court relied on our decision in *Wilson* for the proposition that "the doctrine of transferred intent also applies to non-fatal assaults." *Ruffin,* 642 A.2d at 1293 n. 8.

arise where it will be difficult to demonstrate recklessness.[6] *See, e.g., State v. Gillette,* 102 N.M. 695, 699 P.2d 626 (Ct.App. 1985) (poisoned soda can mailed to one person, but two other unintended victims also drank from it); *People v. Carlson,* 37 Cal.App.3d 349, 112 Cal.Rptr. 321 (1 Dist.1974); *cf. People v. Gaither,* 173 Cal.App.2d 662, 343 P.2d 799 (2 Dist.1959) (defendant sent poisoned candy to ex-wife; she ate none, but four of seven members of her household ate the candy), *cert. denied,* 362 U.S. 991, 80 S.Ct. 1082, 4 L.Ed.2d 1023 (1960).

For the foregoing reasons, I believe it is important to clarify that our holding, as I understand it, simply means that transferred intent may be applied to first-degree murder of a bystander, regardless of whether the defendant also injured his intended victim. Although the majority's explanatory dicta on the theory underlying the transferred intent doctrine provides useful clarification of our prior decisions, I do not believe the majority intends by these statements to overrule *Wilson sub silentio.*

I am authorized to state that Judges RODOWSKY and KARWACKI join in the views expressed herein.

---

**6.** As we observed in *Robinson v. State,* 307 Md. 738, 517 A.2d 94 (1986), "although 'depraved heart' murder does not require that more than one life be placed in imminent danger," *id.* at 751, 517 A.2d at 101, more than "mere negligence" must be shown. We stated that:

> '[D]epraved heart' means something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must [or reasonably should] realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life.

*Id.* at 745, 517 A.2d at 98 (quoting R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 1.6–3 (1983)).