855 A.2d 1220

**Gerard HARRISON**

v.

**STATE of Maryland.**

**No. 70, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 4, 2004.

478

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for petitioner.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

Gerard Harrison fired his .38 caliber pistol six times at a man known as "Valentine" but struck James Cook instead. We issued a writ of certiorari to determine whether the evidence in this case was sufficient to support Harrison's conviction of attempted second-degree murder. Harrison argues that the evidence was not sufficient to prove the intent element of that crime. For the reasons discussed herein, we agree with Harrison and hold that, under the theory of "concurrent intent," the evidence was insufficient to support a finding that Harrison possessed the requisite intent for attempted second-degree murder. We also hold that the doctrine of "transferred intent" does not support the conviction because "transferred intent" may not be applied to prove attempted murder.

## I. Background

Harrison engaged in a shooting in Baltimore City on July 27, 2001. As a result of the incident, the State charged Harrison in a nine-count indictment with: (1) attempted first degree murder in violation of Maryland Code, Article 27, Section 411A (b) (1957, 1996 Repl.Vol.); [1] (2) attempted second

---

1. When Harrison was charged, Article 27 contained the provisions related to the crimes of which he was accused. Those provisions have since been recodified under the Criminal Law Article.

degree murder of Cook in violation of Article 27, Section 411A (a);[2] (3) first-degree assault of Cook in violation of Article 27, 12A–1 (1957, 1996 Repl.Vol., 2000 Supp.);[3] (4) second-degree assault of Cook in violation of Article 27, Section 12A (1957, 1996 Repl.Vol.);[4] (5) reckless endangerment of Cook in violation of Article 27, Section 12A–2 (1957, 1996 Repl.Vol., 2000 Supp.);[5] (6) use of handgun in the commission of a felony or

Article 27, Section 411A(b) provided: "A person who attempts to commit murder in the first degree is guilty of a felony and on conviction is subject to imprisonment for not more than life." This provision currently is codified under Maryland Code, § 2–205 of the Criminal Law Article (2002).

2. Article 27, Section 411A(a) provided: "A person who attempts to commit murder in the second degree is guilty of a felony and on conviction is subject to imprisonment for not more than 30 years." This provision currently is codified under Maryland Code, § 2–206 of the Criminal Law Article (2002).

3. Article 27, Section 12A–1 stated:
(a) *Serious physical injury; use of a firearm.*—(1) A person may not intentionally cause or attempt to cause serious physical injury to another.
(2) A person may not commit an assault with a firearm, including:
(i) A handgun, antique firearm, rifle, shotgun, short-barreled shotgun, or short-barreled rifle, as those terms are defined in § 36F of this article;
(ii) An assault pistol, as defined in § 36H–1 of this article;
(iii) A regulated firearm, as defined in § 441 of this article; and
(iv) A machine gun, as defined in § 372 of this article.
(b) *Penalty.*—A person who violates this section is guilty of the felony of assault in the first degree and on conviction is subject to imprisonment for not more than 25 years.
This provision currently is codified under Maryland Code, § 3–202 of the Criminal Law Article (2002, 2003 Supp.).

4. Article 27, Section 12A provided:
(a) *General prohibition.*—A person may not commit an assault.
(b) *Violation; penalties.*—A person who violates this section is guilty of the misdemeanor of assault in the second degree and on conviction is subject to a fine of not more than $2500 or imprisonment for not more than 10 years or both.
This provision currently is codified under Maryland Code, § 3–203 of the Criminal Law Article (2002).

5. Article 27, Section 12A–2 provided in pertinent part:
(a) *Creation of substantial risk of death or serious physical injury; penalties.*

crime of violence in violation of Article 27, Section 36B (1957, 1996 Repl.Vol., 2000 Supp.); [6] (7) the wearing, carrying, and transportation of a handgun in violation of Article 27, Section 36B (1957, 1996 Repl.Vol., 2000 Supp.); [7] (8) possession of a regulated firearm after having been previously convicted of a misdemeanor carrying a penalty of more than two years imprisonment in violation of Article 27, Section 445(d)(1)(iii)

---

(1) Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine of not more than $5,000 or imprisonment for not more than 5 years or both....
(b) *Applicable conduct.*—(1) Subsection (a)(1) of this section does not apply to any conduct involving:
(i) The use of a motor vehicle as defined in § 11–135 of the Transportation Article; or
(ii) The manufacture, production, or sale of any product or commodity....
(c) *More than one person endangered.*—If more than one person is endangered by the conduct of the defendant, a separate charge may be brought for each person endangered.

The provisions prohibiting the crime of "reckless endangerment" presently exist under Maryland Code, § 3–204 of the Criminal Law Article (2002, 2003 Supp.).

6. Article 27, Section 36B(d) provided:

Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article, whether operable or inoperable at the time of the offense, shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor.

The current provisions that prohibit the use of a firearm in the commission of a felony or crime of violence reside in Maryland Code, § 4–204 of the Criminal Law Article (2002, 2003 Supp.).

7. Article 27, Section 36B(b) provided in relevant part:

Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor ....

Maryland Code, § 4–203 of the Criminal Law Article (2002, 2003 Supp.) sets forth the current statutory prohibitions against wearing, carrying, or transporting a handgun.

(1957, 1996 Repl.Vol., 2000 Supp.); [8] and (9) possession of a regulated firearm after having been previously convicted of a crime of violence in violation of Article 27, Sections 445(d) and 449(e) (1957, 1996 Repl.Vol., 2000 Supp.).[9] On June 12, 2002, in the Circuit Court for Baltimore City, Harrison was convicted of attempted second-degree murder and use of a handgun in the commission of a felony or crime of violence on an agreed statement of facts, which the prosecutor narrated for the record:

The facts would be that, on July 27, 2001, in the fifteen hundred block of Clifton Avenue, the victim in this matter, Mr. James Cook, was standing and talking with friends when he was struck in the neck with a bullet. Investigation revealed that [Harrison] and another unknown person were shooting at someone known only to them only as Valentine, and in the course of the shooting, accidentally struck the victim, Mr. Cook.

Your Honor, a witness was identified. He was taken down to the station and shown a photo array. He observed the photo array and picked out [Harrison] who would be identi-

---

**8.** Article 27, Section 445(d)(1)(iii) provided: "A person may not possess a regulated firearm if the person: (1) Has been convicted of: ... (iii) Any violation classified as a misdemeanor in this State that carries a statutory penalty of more than 2 years. . . ." The possession of regulated firearms is now governed by Maryland Code, § 5–133 of the Public Safety Article (2003).

**9.** Article 27, Section 445(d)(1)(i) provided: "A person may not possess a regulated firearm if the person: (1) Has been convicted of: ... (i) A crime of violence. . . ." The possession of regulated firearms is now governed by Maryland Code, § 5–133 of the Public Safety Article (2003).

Article 27, Section 449(e) stated:

A person who was previously convicted of a crime of violence as defined in § 441(e) of this article or convicted of a violation of § 286 or § 286A of this article, and who is in illegal possession of a firearm as defined in § 445(d)(1)(i) and (ii) of this article, is guilty of a felony and upon conviction shall be imprisoned for not less than 5 years, no part of which may be suspended and the person may not be eligible for parole. Each violation shall be considered a separate offense. This penalty is now provided for by Maryland Code, § 5–133 of the Public Safety Article (2003).

fied in court here today as Mr. Gerard Harrison to my right, with counsel, as the person he knows as Fats and as one of the shooters. I believe the photo array is already in evidence in the court file from the motions hearing. Situationally, the defendant was advised of his rights. He waived his constitutional rights and he did give a statement that was taped.

I believe that and the advisement of rights are already in the court file as well from evidence and motions hearings. During the statement, [Harrison] advised that he and a person known to him as Twin Shitty began firing on a person that they knew as Valentine. [Harrison] stated that he had one gun and the other person had two guns, stating that he had fired six shots and then they both ran. Found out later that somebody other than their intended target was shot.

[I]f called to testify, the ballistics examiner would have stated that the ballistics evidence recovered from the crime scene was consistent with [Harrison's] confession and that the ballistics show that there were three different firearms used and they matched the caliber that [Harrison] described. The victim was taken to Sinai Hospital where he was operated on. All events occurred in Baltimore City, State of Maryland. That would be the statement supporting the guilty plea as a Count Two, attempted murder in the second degree and Count Six, use of a handgun in the commission of a crime of violence.

The statements made by Harrison during a police interrogation on August 22, 2001, which were referred to in the agreed-upon facts, were as follows:

[Officer]: Okay and if you could, in your own words again tell me what you know and what happened as far as what you knew in this case.

Harrison: All I know is that me and another ... another dude, a friend of mines walking up on the basketball court and he had two guns, I had one. We just started shooting in the direction of Valentine.

[Officer]: Of Valentine, and why were you all shooting at Valentine?

Harrison: Because he around there selling some dope.

[Officer]: Okay, and was he told something in the past?

Harrison: He was told in the past not to hustle around there.

[Officer]: Okay, and when you all were shooting in the direction of Valentine, what type of gun did you have?

Harrison: I had a .38.

\* \* \*

[Officer]: Okay. Now when you all were shooting at Valentine, how many shots did you shoot at him?

Harrison: Six.

[Officer]: So did you have any more shots left?

Harrison: No.

The judge imposed concurrent sentences of twelve years imprisonment for attempted second-degree murder and five years imprisonment for the handgun violation.

The Court of Special Appeals affirmed the convictions. *Harrison v. State,* 151 Md.App. 648, 828 A.2d 249 (2003). In addition to affirming the handgun conviction, the court held that the evidence was sufficient to sustain Harrison's conviction of attempted second-degree murder of Cook. *Id.* at 662, 828 A.2d at 257.[10] In reaching this conclusion, the court considered the State's arguments that the intent element of the crime could be supported under theories of "transferred intent," "depraved heart" recklessness, and "concurrent intent." The court concluded that the conviction could not rest on theories of "transferred intent" or "depraved heart" recklessness. *Id.* at 659–660, 828 A.2d at 255. The theory of "transferred intent" fails because, according to the court,

---

10. The court also held that the trial court correctly denied Harrison's motion to suppress statements made to police because those statements had not been induced improperly. *Harrison,* 151 Md.App. at 656, 828 A.2d at 253–54. Harrison did not challenge this holding in his petition for a writ of certiorari.

under *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993), the doctrine only applies when a defendant shoots at his target, misses, and an unintended victim receives a *fatal* injury. *Harrison*, 151 Md.App. at 658, 828 A.2d at 254–55. The court held that "depraved heart" recklessness also does not apply because Harrison's conviction of attempted second-degree murder requires that he had a specific intent to kill; depraved heart" murder, on the other hand, "only requires wanton disregard for human life, . . . a mental state [that] falls short" of the necessary mental element of attempted second-degree murder. *Id.* at 660, 828 A.2d at 255. Nevertheless, in the court's view, the evidence did support a finding of the requisite intent, under the theory of "concurrent intent." *Id.* at 661–62, 828 A.2d at 256–57. The court held that the jury could infer that Harrison "intentionally created a 'kill zone' to accomplish the death of Valentine, the primary victim," and, therefore, the jury could also infer that Harrison had a concurrent intent to kill Cook, who was among those "gathered at the scene of the crime." *Id.* at 662, 828 A.2d at 257.

◼ Harrison petitioned this Court for a writ of certiorari and raised two questions, which we have rephrased and combined into one: Is the evidence sufficient to support a conviction of attempted second-degree murder, where Harrison fired six shots at one person, missed that person, but hit another person causing injury and not death? [11] We conclude that the evidence fails to support a conviction for attempted second-degree murder based on the theory of "concurrent intent" because the stipulated facts do not prove that Cook inhabited the "kill zone" when Harrison fired the errant shots. Fur-

---

11. Harrison phrased his two questions as follows:
1. Is an intent to kill the named victim a factual and legal prerequisite to a conviction of attempted murder even where the theory is one of "concurrent" intent?
2. May a conviction for attempted second-degree murder of an unintended victim be sustained on the theory that stipulated facts could support a finding of concurrent intent to kill the intended and unintended victims where the Statement of Facts in support of the conviction states that the defendant shot the victim accidentally, while aiming at another?

thermore, the State's reliance on the doctrine of "transferred intent" also fails inasmuch as that doctrine does not apply to a charge of attempted murder.[12]

## II. Standard of Review

Our opinion in *Moye v. State*, 369 Md. 2, 12–13, 796 A.2d 821, 827 (2002) sets out the appropriate standard of review in the instant case:

The standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See State v. Albrecht*, 336 Md. 475, 478–79, 649 A.2d 336, 337 (1994). We view the evidence in the light most favorable to the prosecution. *See id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) and *Branch v. State*, 305 Md. 177, 182–83, 502 A.2d 496, 498 (1986)). We give "due regard to the [fact

---

12. The question of evidentiary sufficiency is properly before us. After the prosecutor narrated the statement of agreed facts, Harrison made a generalized motion for a judgment of acquittal, which was denied. Had his case been tried before a jury, in order to preserve issues of evidentiary sufficiency on appeal, Harrison would have had to make his motion by "stat[ing] with particularity all reasons why the motion should be granted." *See* Maryland Rule 4–324(a); *Tull v. State*, 230 Md. 152, 186 A.2d 205 (1962); *Fraidin v. State*, 85 Md.App. 231, 583 A.2d 1065, *cert. denied*, 322 Md. 614, 589 A.2d 57 (1991).

In Harrison's case, however, the trial judge acted as the trier of fact; therefore, no particularized motion was necessary. Maryland Rule 8–131(c) requires that, "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence." Maryland Rule 8–131(c). Thus, where a defendant has been convicted in a nonjury trial, preserving the issue of evidentiary sufficiency does not depend on a motion for a judgment of acquittal. *See Nicholson v. State*, 229 Md. 123, 125, 182 A.2d 31, 32 (1962) ("The trial was before the court; consequently it was not necessary to make a motion for a judgment of acquittal in order to preserve the right to full appellate review."). This is so even when, as in the instant case, the State has proceeded on an agreed statement of facts. *See Barnes v. State*, 31 Md.App. 25, 29–30, 354 A.2d 499, 502 (1976) ("In a criminal action in which the court is the trier of fact, the appellate court must entertain the issue of the sufficiency of the evidence when presented on appeal even in the absence of a motion for judgment of acquittal below.").

finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675, 685 (1997), cert. denied, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (quoting *Albrecht,* 336 Md. at 478, 649 A.2d at 337).

### III. Discussion

 "Murder is the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation." *Ross v. State,* 308 Md. 337, 340, 519 A.2d 735, 736 (1987). The malevolent states of mind that qualify are: (1) the intent to kill, (2) the intent to do grievous bodily harm, (3) the intent to do an act under circumstances manifesting extreme indifference to the value of human life (depraved heart), or (4) the intent to commit a dangerous felony. *Id.* The General Assembly has determined that certain murders qualify as murder in the first degree, such as murders committed in the perpetration of enumerated felonies or any kind of willful, deliberate and premeditated killing. *See* Maryland Code, Article 27 §§ 407—410 (1957, 1996 Repl.Vol.) (setting forth the various circumstances in which a murder will be classified as murder in the first degree). Second-degree murder includes all other types of murder. *See* Code, Art. 27 § 411 ("All other kinds of murder shall be deemed murder in the second degree.").

 To be guilty of the crime of attempt, one must possess "a specific intent to commit a particular offense" and carry out "some overt act in furtherance of the intent that goes beyond mere preparation." *State v. Earp,* 319 Md. 156, 162, 571 A.2d 1227, 1230 (1990); *Bruce v. State,* 317 Md. 642, 646, 566 A.2d 103, 104 (1989). For attempted second-degree murder, the State has the burden to prove "a specific intent to kill—an intent to commit grievous bodily harm will not suffice." *Earp,* 319 Md. at 164, 571 A.2d at 1231; *see* LaFave & Scott, Criminal Law, § 6.2 at 500–01 (2d ed. 1986) ("[O]n a charge of attempted murder it is not sufficient to show that the defendant intended to do serious bodily harm or that he

acted in reckless disregard for human life.... [A]ttempted murder requires an intent to bring about the result described by the crime of murder (i.e., the death of another)."); Clark & Marshall, A TREATISE ON THE LAW OF CRIMES, § 4.08 (7th ed. 1967) ("To constitute an attempt to murder, specific intent to kill is necessary, and an intent to commit any other crime will not suffice."). One has committed second-degree attempted murder when he or she harbors a specific intent to kill the victim and has taken a substantial step toward killing the victim.

Harrison challenges his conviction for attempted second-degree murder, arguing that he did not possess the requisite intent to murder Cook because his target was Valentine. In support of this argument, Harrison relies on the agreed-upon facts, which state that Harrison "accidentally" struck the victim, Cook. Harrison contends that the term "accidentally" characterizes his state of mind at the time of the shooting, thereby nullifying the specific intent to kill the victim and obviating guilt of attempted second-degree murder.

The State responds that the term "accidentally" does not characterize Harrison's state of mind, but, rather, "accidentally" refers to the fact that the bullets, by accident, hit Cook instead of Valentine, the intended target. The State argues that the facts support the trial court's determination that Harrison had a specific intent to kill Valentine by shooting six bullets at him. This specific intent to kill, according to the State, should be attributed to Harrison for shooting Cook under two theories: "concurrent intent" and "transferred intent." As to the theory of "concurrent intent," the State argues that, by firing six shots to kill Valentine, Harrison intentionally created a "kill zone." Citing to the considered dicta explicated in Judge Chasanow's discussion for the Court majority in *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), the State maintains that the theory of "concurrent intent" functions to apply Harrison's specific intent to kill to everyone in that zone, including Cook. Under the theory of "transferred intent," the State argues, Harrison's intent to kill

Valentine transferred to Cook, the person who actually sustained injury.[13]

■ We first dispose of Harrison's argument that the term "accidentally" in the agreed statement of facts defines his *mens rea* at the time of the shooting. Harrison's reliance on that term is not persuasive. The term "accidentally" describes the outcome of Harrison's act, not his state of mind. Furthermore, in Harrison's statement to the police, which is incorporated by reference in the agreed statement of facts, Harrison admits that he intentionally fired his handgun at Valentine. When a police officer asked what happened, Harrison replied that he and a friend walked to the basketball court and "just started shooting in the direction of Valentine." The officer asked why, and Harrison responded, "Because he around there selling some dope .... He was told in the past not to hustle around here." From this evidence, as well as the agreed-upon statement that Harrison "fired six shots at a person [he] knew as Valentine," the trial judge reasonably could have inferred that the shooting was no accident. The trial judge's conclusion that Harrison had a specific intent to kill is supported by the evidence.

Harrison argues, nonetheless, that, even if he did maintain a specific intent to kill, it was directed at Valentine and not at Cook, the one who suffered the injury. Consequently, we must determine whether the necessary specific intent as against Cook could derive from Harrison's specific intent to kill Valentine; or in other words, does Harrison's specific intent to kill Valentine satisfy the requisite intent for attempted second-degree murder, when the actual victim (and who alone was named in the indictment) in this case was a bystander? The State contends that the theories of "concurrent intent" and "transferred intent" support its assertion that

---

13. Harrison was not charged with the crime of attempted murder against Valentine, Harrison's primary target, and the State has not argued that Harrison's conviction should be sustained on that basis. Accordingly, we need not discuss the efficacy of the evidence in this case with regard to a conviction of attempted second-degree murder against Valentine.

Harrison's specific intent to kill fulfills the intent element as against Cook.

## A. Concurrent intent

The Court of Special Appeals upheld Harrison's conviction of attempted murder because a specific intent to murder Cook could be inferred under the theory of "concurrent intent." *Harrison*, 151 Md.App. at 662, 828 A.2d at 257. This theory emerged from the discussion in *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993), in which the Court expressed its disapproval of the use of "transferred intent" in cases where the defendant faced charges of attempted murder of a bystander. *See* LeEllen Coacher & Libby Gallo, *Criminal Liability: Transferred and Concurrent Intent*, 44 A.F.L.REV. 227, 235 (1998). The *Ford* Court discussed the doctrine of "concurrent intent" to "explain[ ] and justif[y]" the result in *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988), the case in which this Court held that "transferred intent" could be used to prove the specific-intent element of attempted murder of a bystander. *Ford*, 330 Md. at 716, 625 A.2d at 1000. Explaining the distinction between "transferred intent" and "concurrent intent," Judge Chasanow for the Court stated:

In transferred intent, the intended harm does not occur to the intended victim, but occurs instead to a second . . . victim. The actual result is an unintended, unanticipated consequence of intended harm. For example, consider a defendant who shoots a single bullet at the head of A, standing with B and C. If the defendant misses A and instead kills B, the defendant's intent to murder A will be transferred to allow his conviction for B's murder. The intent is concurrent, on the other hand, when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.

*Id.* To further distinguish between the two theories, the Court offered a hypothetical example of the application of "concurrent intent":

[A]n assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group .... When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A.

*Id.* at 716–17, 625 A.2d at 1000–01. The Court summed up the rule of "concurrent intent" as follows: "Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." *Id.* at 717, 625 A.2d at 1001.[14]

The *Ford* Court then turned its attention to the facts of *Wilson,* which, according to the Court, "reached the right result" but for the wrong reasons. Retroactively applying the theory of "concurrent intent" to the facts in *Wilson,* the Court stated that the jury could have found that the defendant in that case intended to create a "kill zone" by firing multiple bullets and that "everyone in the path" of the bullets were intended targets. *Id.* at 717–18, 625 A.2d at 1001. The Court concluded: "[T]he bystander victim, was obviously in the ... direct line of fire and the evidence permitted finding concur-

---

14. The Court stated that "concurrent intent" differs from a "depraved heart" scenario because, under the doctrine of "concurrent intent," the specific intent to kill can be inferred from the circumstances, whereas a defendant with a "depraved heart" has no specific intent to kill. *Ford,* 330 Md. at 717 & n. 15, 625 A.2d at 1001 & n. 15.

rent intent to kill everyone in the path of the bullets." *Id.* at 718, 625 A.2d at 1001.[15]

The doctrine of "concurrent intent" also has found favor in several other jurisdictions. For example, using "concurrent intent," the Supreme Court of California, in *People v. Bland,* 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (2002), upheld attempted-murder convictions that arose out of a gang-related shooting resulting in the death of the intended victim and injury to two bystanders. *Id.* at 1120–21. Wilson, a member of the Rolling 20's Crips, was driving through a Long Beach neighborhood with two passengers when he encountered Bland and a friend, both members of the Insane Crips. *Id.* at 1110. Bland approached Wilson's car, began shooting into the vehicle, and, along with his friend, continued to shoot as the car started to drive away. Wilson died, and both of his passengers received non-fatal gunshot wounds. *Id.* During Bland's trial, the jury was instructed according to the doctrine of "transferred intent," after which Bland was convicted of first-degree murder of Wilson and attempted first-degree murder of the two injured bystanders. *Id.* at 1110–11.

The Supreme Court of California held that Bland's convictions for attempted murder could not be premised upon "transferred intent" because, in California, that theory did not apply to attempted murder. *Id.* at 1117. Nevertheless, the Court concluded that the convictions could rest upon the theory of "concurrent intent." After quoting *Ford* at length, the California court stated the facts before it "virtually compelled" an inference that Bland harbored a specific intent to kill all those in harm's way:

> Even if the jury found that [Bland] primarily wanted to kill Wilson rather than Wilson's passengers, it could reasonably also have found a *concurrent* intent to kill those passengers when [Bland] and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding

---

**15.** Since the decision in *Ford,* the Court of Special Appeals has applied the theory of "concurrent intent" in at least one reported opinion, *Harvey v. State,* 111 Md.App. 401, 681 A.2d 628 (1996).

fully supports attempted murder convictions as to the passengers.

*Id.* at 1119.

The court in *Ruffin v. United States,* 642 A.2d 1288, 1298 (D.C.1994) also applied a concurrent-intent analysis. In *Ruffin,* the defendant and four others fired multiple shots at an intended target, Younger. *Id.* at 1290. The shooting left Younger merely injured, but bullets also hit two bystanders, killing one and injuring the other. *Id.* at 1290. The defendant was convicted of three specific intent crimes, first-degree murder of the deceased bystander, Williams, and assault with intent to kill while armed on Younger and Walker, the injured bystander. *Id.* Holding that the assault-with-intent-to-kill conviction was sustainable under the doctrine of "concurrent intent," the court declared that, by firing ten to fifteen shots— "a hail of bullets"—at his intended victim, Ruffin and his cohort possessed a "concurrent intent to kill everyone in the path of the bullets," including the unintended victim who was in the "direct line of fire." *Id.* at 1298 (quoting *Ford,* 330 Md. at 717–18, 625 A.2d at 1001).

In *United States v. Willis,* 46 M.J. 258 (1997), the United States Court of Appeals for the Armed Forces also used "concurrent intent" to uphold an attempted-murder conviction. Willis was facing charges of attempted murder of his wife, so he concocted an elaborate plan to kill her as well as his aunt, whom he learned planned to testify against him. *Id.* at 259. On the day of a hearing in the case against him, Willis first shot and killed his wife. He then went to the base legal office, where he found his aunt, his uncle, and Captain Hatch, the Chief of Military Justice. The uncle tried to hold the office door closed, but because Willis was trying to force his way inside, the office door remained open by six inches. When Willis saw Captain Hatch between the six-inch gap, Willis fired one shot at him but missed. Willis then reached around the door, aimed his pistol behind the door where his aunt and uncle were, and fired three random shots, intending to kill his aunt. *Id.* Willis pled guilty to attempting to murder the aunt, uncle, and Captain Hatch.

On appeal, Willis challenged the plea of guilty to the attempted murder of the uncle, who was not his primary target. *Id.* The court, after explaining the doctrine of "concurrent intent" as discussed in *Ford* and *Ruffin,* stated that:

> Under a concurrent-intent approach, [the court] infer[s] the intent when the result was the same as that intended or at least a natural and probable consequence of the intended result. As long as the defendant has the requisite intent for the intended crime, the defendant will be responsible for the natural and probable consequences of the act.

*Id.* at 261. The court held that Willis' actions were "sufficient to establish that he had the concurrent intent to kill both his aunt and his uncle." *Id.* Willis created a "kill zone" by shooting "behind the door in three different spots, moving his pistol randomly between the shots." *Id.* Therefore, according to the court, Willis was responsible for the "natural and probable consequences" of his act, including "the death or grievous bodily harm of whoever was behind the door." *Id.* at 262.

■ In concurrent-intent analyses, courts focus on the "means employed to commit the crime" and the "zone of harm around [the] victim." *Ford,* 330 Md. at 717, 625 A.2d at 1001. The essential questions, therefore, become (1) whether a factfinder could infer that the defendant intentionally escalated his mode of attack to such an extent that he or she created a "zone of harm," and (2) whether the facts establish that the actual victim resided in that zone when he or she was injured.

■ As to the first question, courts have permitted an inference that the defendant created a kill zone when a defendant, like Harrison, fired multiple bullets at an intended target. In *Wilson,* the defendant and his brother fired "multiple bullets" from two handguns. *Ford,* 330 Md. at 718, 625 A.2d at 1001 (discussing *Wilson,* 313 Md. at 601, 546 A.2d at 1042). The defendant in *Bland* fired a "flurry of bullets," and in *Ruffin,* the defendant and his cohort fired ten or fifteen rounds, which the court described as "a hail of bullets." *Bland,* 121 Cal.Rptr.2d 546, 48 P.3d at 1119; *Ruffin,* 642 A.2d

at 1298; *see also Hunt v. United States*, 729 A.2d 322, 326 (D.C.1999) (holding that by "unloading multiple 'quick fire' shots" to hit the target, the defendant created a "kill zone" that "ensnared" the bystander); *Walls v. United States*, 773 A.2d 424, 434 (D.C.2001) (holding that evidence of the defendant firing "several shots" permitted a jury inference that the defendant created a "zone of danger"); *People v. Smith*, 9 Cal.Rptr.3d 387 (Cal.App.2004) (allowing an inference of concurrent intent to kill the intended victim and unintended victim where the defendant fired a "single shot" at a moving vehicle containing the target and a bystander "in the line of fire"). Just three random shots directed behind a door gave rise to a permissible inference of a "killing zone" in *Willis*, 46 M.J. at 261–62. These methods of attack are similar to Harrison's six shots at Valentine. We conclude, therefore, that the facts support an inference that Harrison created a "kill zone" around Valentine and that Harrison had the specific intent to kill everyone inside of the zone.

The facts in this case, however, *do not* permit an inference that Cook, the unintended victim, inhabited the "kill zone" when Harrison's bullet hit him. Courts that have considered the issue all have relied on specific facts showing the location of the unintended victim either in relation to the intended victim or in relation to the defendant. In *Bland*, for example, the unintended victims occupied the same car as the intended victim when the defendant fired a hale of bullets at the car. *Bland*, 121 Cal.Rptr.2d 546, 48 P.3d at 1110. When, in *Hunt*, the defendant fired multiple "quick fire" shots inside the automobile in which the primary victim sat, the murdered bystander was standing right next to the car. 729 A.2d at 323. Also, in *Willis*, the court held that the unintended victim resided in the "kill zone" behind an office door where he and the intended victim tried to avoid the defendant's random gunshots. 46 M.J. at 261; *see also Harvey*, 111 Md.App. at 405, 434–35, 681 A.2d at 630, 645 (holding that, where the injured bystander was "in close proximity" to the intended target, the "evidence was sufficient to permit a finding that [the bystander] was in [the] 'kill zone' "). The unintended

victims in *Ruffin* occupied a car "in the vicinity of the shooting" and were in the defendant's "direct line of fire." 642 A.2d at 1290, 1298.

 In the present case, however, the State's argument that Cook was in Harrison's "kill zone" at the time of the shooting lacks adequate support from the evidence. According to the agreed statement of facts, "in the fifteen hundred block of Clifton Avenue, [Cook] was standing and talking with friends when he was struck in the neck with a bullet." Although this statement shows generally where Cook was standing when he was shot, it and the remaining evidence provide no indication where Cook was in relation to Valentine or Harrison. A fact finder, let alone an appellate court, has no idea, based on this meager evidence, whether Cook stood in Harrison's direct line of fire, next to the intended victim, or at a distance from Harrison or his target, Valentine. Absent more specific evidence of Cook's location in relation to the shooter and the intended victim, no inference is permissible that Cook occupied the "kill zone" when he was struck by the bullet. Consequently, we disagree with Court of Special Appeals and conclude that the agreed statement of facts does not provide sufficient evidence to support a finding of "concurrent intent" on the part of Harrison.

 This Court and the Court of Special Appeals have heretofore made clear that prosecutors risk acquittal when a not-guilty agreed statement of facts fails to support the legal theory upon which the State relies. *See Bruno v. State*, 332 Md. 673, 684, 632 A.2d 1192, 1197 (1993) (noting that the State "risk[s] an acquittal" by proceeding on a not-guilty agreed statement of facts that does not present sufficient evidence to support the crimes charged); *Barnes v. State*, 31 Md.App. 25, 28, 354 A.2d 499, 501 (1976) (stating that, even in a case based on an agreed statement of facts, "an accused must be acquitted if the evidence is not legally sufficient to sustain his conviction"). We renew that admonition today. If a prosecutor proceeds on a not-guilty agreed statement of facts, he or she should take care to assure that the statement contains

evidence to support each element of the crime or crimes charged, or else acquittal necessarily will follow.

## A. Transferred Intent

The State argues that the theory of "transferred intent" also supports the trial judge's conclusion that Harrison possessed the intent required for attempted second-degree murder. The theory of "transferred intent" has received considerable attention over the years in this Court and the Court of Special Appeals. *See, e.g., Poe v. State,* 341 Md. 523, 671 A.2d 501 (1996); *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993); *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988); *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974); *Williams v. State,* 117 Md.App. 55, 699 A.2d 473 (1997); *Harvey v. State,* 111 Md. App. 401, 681 A.2d 628 (1996); *Harrod v. State,* 65 Md.App. 128, 499 A.2d 959 (1985). We first recognized the viability of the doctrine in *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974), which involved a classic question of "transferred intent": whether Gladden was guilty of first-degree murder when he shot and killed a twelve-year-old bystander in the course of attempting to kill a man named Seigel. *Id.* at 384–85, 330 A.2d at 177. Judge O'Donnell traced the common law origin of "transferred intent" back to 1576, when the court in *Reg. v. Saunders,* 2 Plowd. 473, 474a, 75 Eng.Rep. 706, 708 (1576) stated:

And therefore it is every man's business to foresee what wrong or mischief may happen from that which he does with an ill-intention, and it shall be no excuse for him to say that he intended to kill another, and not the person killed. For if a man of malice prepense shoots an arrow at another with an intent to kill him, and a person to whom he bore no malice is killed by it, this shall be murder in him, for when he shot the arrow he intended to kill, and inasmuch as he directed his instrument of death at one, and thereby has killed another, it shall be the same offense in him as if he had killed the person he aimed at, for the end of the act shall be construed by the beginning of it, and the last part shall taste of the first, and as the beginning of the act had

malice prepense in it, and consequently imported murder, so the end of the act, *viz.* the killing of another shall be in the same degree, and therefore it shall be murder, and not homicide only.

*Gladden,* 273 Md. at 390–91, 330 A.2d at 180 (quoting *Saunders,* 2 Plowd. at 474a, 75 Eng.Rep. at 708). Summarizing the court's holding in *Saunders,* Judge O'Donnell quoted the works of Sir Matthew Hale and Sir William Blackstone. Hale stated:

To these may be added the cases above mentioned, *viz.* if A. by malice forethought strikes at *b.* and missing him strikes C. whereof he dies, tho he never bore any malice to C. yet it is murder, and the law transfers the malice to the party slain; the like of poisoning, *sed de his supra cap.*

*Id.* at 391, 330 A.2d at 181 (quoting Sir Matthew Hale, 1 History of the Pleas of the Crown at 466). Blackstone described the same rule as follows:

Thus if one shoots at A and misses him, but kills B, this is murder; because of the previous felonious intent, which the law transfers from one to the other. The same is the case where one lays poison for A; and B, against whom the prisoner had no malicious intent, takes it, and it kills him; this is likewise murder.

*Id.* at 391–92, 330 A.2d at 181 (quoting Sir William Blackstone, 4 Commentaries on the Laws of England 201 (Cooley, 3d ed., 1884)).

 Reflecting upon the viability of the doctrine, Judge O'Donnell also consulted several modern sources, including Clark and Marshall, A Treatise on the Law of Crimes, § 10.06 (6th ed., 1958), which offered this illustration of "transferred intent":

Whenever an accountable man kills another intentionally, he is guilty of murder with express malice unless the killing is justifiable or excusable, or unless there are such circumstances of provocation as will reduce the homicide to manslaughter. This principle is applied when a man kills one person when he intended to kill another. For example, if a

man shoots at one person with intent to kill him, and unintentionally kills another, or sets poison for one person and another drinks it and dies, it is murder with express malice of the person killed, though he is a friend.

*Gladden,* 273 Md. at 392, 330 A.2d at 181. The Court was persuaded that the doctrine "has lost none of its patina by its application over the centuries down unto modern times; its viability is recognized by its current acceptance and application." *Id.* at 392, 330 A.2d at 181. Rather, according to the Court's review of "transferred intent" in other states, "there is a singular unanimity among the decisions in the overwhelming majority of the states" that a homicide committed upon an unintended target "partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the blow fallen upon the intended victim instead of the bystander." *Id.* at 392, 330 A.2d at 181. The Court held, "upon application of the principles of common law and the overwhelming weight of judicial authority, . . . that the doctrine of 'transferred intent' is the law of Maryland . . . ." *Id.* at 405, 330 A.2d at 189. Described simply, "transferred intent" operates so that "the *mens rea* of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim." *Id.* at 405, 330 A.2d at 189.

Years later, in *Wilson,* this Court extended the application of "transferred intent" to cover circumstances where the unintended victim suffered injury and not death. 313 Md. 600, 546 A.2d 1041. In *Wilson,* two brothers became involved in a dispute with Brown, and after the brothers threatened to pistol-whip him, Brown fled the scene. *Id.* at 601, 546 A.2d at 1042. Both brothers fired multiple times at Brown, who evaded the bullets. *Id.* at 601–02, 546 A.2d at 1042. One of the "errant shots" struck an innocent bystander, Kent, paralyzing him and leaving him unable to walk or speak. *Id.* at 602, 546 A.2d at 1042. The brothers were convicted of attempted murder of both Brown, the intended target, and Kent, the unintended victim. *Id.* On appeal, one brother, Timothy Wilson, argued that he did not possess the specific

intent to murder Kent, and the doctrine of "transferred intent" did not apply to attempted murder. *Id.*

The Court interpreted *Gladden* as not limiting "the doctrine's applicability to only cases of completed homicide" but, instead, allowing "transferred intent" to extend "to all situations where a defendant's intended act (which in all other respects constitutes a crime) 'affects' or 'inflicts harm upon' an unintended victim." *Id.* at 603–04, 546 A.2d at 1043. Accordingly, the Court held "that the doctrine of transferred intent applies to the crime of attempted murder and that the *mens rea* or specific intent of a defendant as to his intended victim will carry over and determine his culpability when such criminal conduct causes injury to an unintended victim." *Id.* at 609, 546 A.2d at 1045.

The breadth of the *Wilson* holding was called into question in *Ford,* 330 Md. at 714, 625 A.2d at 999, in which Judge Chasanow, writing on behalf of the Court stated: "We believe *Wilson* should not have applied transferred intent to attempted murder." Ford was one of several individuals who stood along the Capital Beltway, waved their arms to slow traffic, and then hurled large rocks at passing cars. *Id.* at 689–91, 625 A.2d at 987–88. The rocks hit between fifteen and forty cars, severely damaging the cars and injuring occupants. *Id.* at 690, 625 A.2d at 987–88. For his role in these attacks, Ford was convicted of several crimes, including assault with attempt to disable. *Id.* at 689, 625 A.2d at 987. He challenged the convictions of assault with attempt to disable on the ground that the State did not prove that he possessed a specific intent to disable a person. *Id.* at 702, 625 A.2d at 993–94. Ford argued that the evidence reflected only a " 'generalized malevolence' and not a specific intent directed to a specific victim." *Id.* at 707, 625 A.2d at 996.

This Court rejected Ford's argument and held that the evidence was sufficient to support a rational inference of such an intent. *Id.* at 705, 625 A.2d at 994–95. The Court reasoned that the jury could infer that, by hurling a rock through the windshields of fast-moving vehicles, Ford "created a zone

of extreme peril inside the vehicles," *id.* at 707, 625 A.2d at 996, and explained:

Within this zone [of peril], many or all occupants of the vehicles would likely be harmed, whether by the rock, the flying glass, or the drivers' losing control of the vehicle. Under these circumstances, one act, the throwing of a single rock, could foreseeably cause multiple injuries. Where his actions were such that a single act could be expected to cause harm to all the vehicles' occupants, the jury reasonably concluded that Ford had the specific intent to disable all the vehicles' occupants, not just a "generalized malevolence." A defendant can be convicted of multiple specific intent crimes from one act when it can be inferred that he intended to cause harm to more than one victim. Because of the potential for multiple injuries from Ford's acts, the jury could properly have inferred an intent to disable all the occupants of the vehicles, not just a "generalized malevolence" as Ford contends.

*Id.* at 707–08, 625 A.2d at 996.

Although the Court in *Ford* rested its holding solely on these grounds, Judge Chasanow went a step beyond this analysis to discuss the issue of "transferred intent," which the Court of Special Appeals had addressed at length in its opinion. *Id.* at 709, 625 A.2d at 997. The Court took the position that "transferred intent" should not apply where "the crime intended has actually been committed against the intended victim . . ." *Id.* at 712, 625 A.2d at 998. This is so because "the doctrine was intended to enable conviction of [the] defendant of the crime he intended to commit only when that crime was not committed upon the intended victim." *Id.* at 710–11, 625 A.2d at 998 (emphasis omitted). In addition, the Court saw the "underlying rationale for the doctrine" as suggesting that it should apply "only when, without the doctrine, the defendant could not be convicted of the crime at issue because the mental and physical elements [the *mens rea* and *actus reus* ] do not concur as to either the intended or the actual victim." *Id.* at 711, 625 A.2d at 998.

This view, Judge Chasanow recognized, "seems at odds" with the Court's holding in *Wilson* that a conviction of attempted murder against an unintended victim could be sustained even though the defendant also had been convicted of attempted murder against the intended victim. *Id.* at 713, 625 A.2d at 999. The Court insisted that applying "transferred intent" to the attempted murder of an unintended victim would contradict the purpose of the doctrine by multiplying criminal liability when all of the elements of the crime had already been established with respect to the intended victim. *Id.* at 714, 625 A.2d at 999. As another reason for not applying "transferred intent" to attempted murder, Judge Chasanow stated that the "crime of attempted murder requires no physical injury to the victim." *Id.* at 715, 625 A.2d at 1000. Contemplating an attempted murder scenario in which a shooting left no bystanders injured, he considered it "virtually impossible to decide to whom the defendant's intent should be transferred" and could conceive of "no rational method" for deciding how to transfer the defendant's intent when many victims could have been "frightened and thereby assaulted by the shot." *Id.* at 715–16, 625 A.2d at 1000.

Three judges disagreed with the rejection of the doctrine of "transferred intent" in attempted murder cases. Judge McAuliffe's concurring opinion in *Ford*, joined by Judges Rodowsky and Karwacki, characterized the majority's discussion of "transferred intent" as "dictum," attempting to "invalidate a portion of [the] doctrine that [the Court had] recently and specifically approved in [*Wilson* ]." *Id.* at 724, 625 A.2d at 1004 (McAuliffe, J., concurring). The three judges viewed the majority's limitation on the transferred-intent doctrine as presenting "interesting problems" for future prosecutions:

> Assume, for example, that the defendant, intending to kill *A,* shoots and wounds him, but the bullet passes through *A* and kills *B.* Under the Court's theory, I assume the defendant would be guilty of the murder of *B,* although also guilty of attempted murder or assault with intent to murder *A.* If *A* had also died, the Court would hold that the defendant could not be convicted of the murder of *B,* but only of battery, or

perhaps manslaughter. What happens, then, if the defendant is convicted of the murder of *B* while *A* is still alive, but *A* dies of wounds received in the assault within a year and a day of the shooting?

*Id.* at 726, 625 A.2d at 1005. In light of these potential problems, the concurrence concluded that the "Court goes too far in its attempt to limit the utilization of the doctrine of transferred intent in criminal cases." *Id.*

The Court revisited the *Ford* disagreement in *Poe v. State,* 341 Md. 523, 671 A.2d 501 (1996), in which Judge Chasanow, again writing for the Court, addressed the factual scenario suggested by Judge McAuliffe in his *Ford* concurrence. Poe, in the course of a heated exchange with his estranged wife, retrieved a shotgun from the trunk of his car and, shouting, "Take this, bitch," fired a single .50 caliber slug at her. *Id.* at 526, 671 A.2d at 502. The bullet passed through the arm of Ms. Poe, his intended target, and struck a six-year-old bystander in the head. *Id.* Ms. Poe suffered a non-fatal injury, but the child died instantly. *Id.* At Poe's trial, the judge instructed that "if the jury would have convicted Mr. Poe ... had she died as a result of the shot, they could convict Mr. Poe of first degree murder of [the child], because the intent to kill Ms. Poe transfers to [the child], the unintended victim." *Id.* at 527, 671 A.2d at 502–03. The jury found Poe guilty of first-degree murder of the child and attempted first-degree murder of Ms. Poe. *Id.,* 671 A.2d at 503.

In *Poe,* the primary issue was whether the trial court erred "in ruling that the doctrine of transferred intent applies where a defendant intends to kill A, shoots and wounds A, but kills B, an unintended victim, by that same shot." 341 Md. at 528, 671 A.2d at 503. Relying on *Ford,* Poe maintained that, because he had completed the crime of attempted murder of Ms. Poe, his specific intent to kill her could not also be transferred to the child. *Id.* at 529–30, 671 A.2d at 504. This Court disagreed, explaining that limitations on "transferred intent" apply only when the defendant shoots at an intended victim and, instead, wounds an unintended victim *"without killing either."* *Id.* at 530, 671 A.2d at 504 (emphasis in

original). *Ford*, therefore, was inapposite to the facts of *Poe*, because the unintended victim in *Poe* had been killed, not merely injured. *Id.* The Court held that "transferred intent" applied to the death of the bystander, despite the fact that Poe also had wounded his intended victim. *Id.* The Court narrowed the question of when to apply "transferred intent" to "what could the defendant have been convicted of had he accomplished his intended act?" and spoke of *Ford* only to note why the defendant's reliance on that case was misplaced. *Id.* at 531, 671 A.2d at 504.

The Court unanimously agreed with the result in *Poe*, but three judges again joined a concurring opinion to voice concerns over the future use of "transferred intent." Judge Raker, the author of the concurring opinion, took issue with the majority's "overly broad" assertion that "the doctrine of transferred intent does not apply to attempted murder when there is no death." *Id.* at 535, 671 A.2d at 507 (Raker, J., concurring). The correct statement of the law, in Judge Raker's view, "is that transferred intent should not apply to attempted murder if no one is injured." *Id.* For support, Judge Raker cited several cases from England and the United States, in which courts have held the doctrine of "transferred intent" does apply when bystanders received non-fatal injuries. *Id.* at 537, n. 3, 671 A.2d at 507, n. 3.

Judge Raker also presented various policy considerations for the application of the doctrine without regard to whether the unintended victim was killed or merely injured, to include that extended application of "transferred intent" would "ensure proportionate punishment of criminal offenses" and prevent increased difficulty in prosecuting criminals for the harm inflicted on bystanders. *Id.* at 539, 671 A.2d at 509. In support, Judge Raker posed the following hypothetical:

[A] defendant, A, participates in a drive-by shooting on a public street, intending to kill B, but instead non-fatally injuring B, and non-fatally injuring bystander C. Although A may be convicted of attempted murder of B, it will be difficult to convict A of the attempted murder of C, or of assault with intent to kill C. Without transferred intent,

the State will be required to offer separate proof of intent for each victim, e.g., by demonstrating "depraved heart." While firing a "hail of bullets" at a person on a busy street may be *prima facie* evidence of a depraved heart, numerous factual situations may arise where it will be difficult to demonstrate recklessness.

*Id.* at 539–40, 671 A.2d at 509. In conclusion, Judge Raker stated her understanding that the majority held simply that transferred intent may be applied to first-degree murder of a bystander, "regardless of whether the defendant also injured his intended victim," and ergo, *Wilson* remains viable. *Id.* at 540, 671 A.2d at 509.

 The question now before us is almost identical to the one debated in *Wilson, Ford,* and *Poe:* whether "transferred intent" may apply in an attempted murder case, where a bystander has received a non-fatal injury. Citing *Ford,* the Court of Special Appeals held that the transferred-intent doctrine "[could] not be used to sustain [Harrison's] conviction" because it did not apply in cases charging attempted murder of an unintended victim. *Harrison,* 151 Md.App. at 658, 828 A.2d at 254–55. We conclude that the Court of Special Appeals was correct in holding that the theory of transferred intent applies only when a bystander has suffered a fatal injury. This holding, as we shall explain, comports with numerous other jurisdictions who have considered the issue and avoids the numerous logical hurdles that arise when "transferred intent" is applied to inchoate offenses.

A number of other jurisdictions have rejected the doctrine of transferred intent in relation to the crime of attempted murder of an unintended victim. *See, e.g., Ramsey v. State,* 56 P.3d 675 (Alaska App.2002); *Jones v. State,* 159 Ark. 215, 251 S.W. 690 (1923); *People v. Bland,* 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (2002); *State v. Hinton,* 227 Conn. 301, 630 A.2d 593 (1993); *State v. Brady,* 745 So.2d 954 (Fla.1999); *State v. Williamson,* 203 Mo. 591, 102 S.W. 519 (1907); *People v. Fernandez,* 88 N.Y.2d 777, 650 N.Y.S.2d 625,

673 N.E.2d 910 (1996); *State v. Shanley,* 20 S.D. 18, 104 N.W. 522 (1905).

The Supreme Court of California extensively discussed the issue of "transferred intent" for attempt crimes in *People v. Bland,* 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (2002). That case involved a multiple shooting in which the intended victim was killed and two bystanders received non-fatal injuries. *Id.* at 1110. The Supreme Court of California declined to apply the theory of "transferred intent" in considering whether the evidence was sufficient to support the defendant's convictions of attempted first-degree murder of the bystanders. *Id.* The California court held that "to be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." *Id.* at 1117. In other words, "[s]omeone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of attempted murder of the intended victim, but not the others." *Id.* at 1117.

Drawing from this Court's discussion in *Ford,* the California court examined the potential pitfalls of applying the doctrine to "inchoate crimes," including the fact that attempted murder does not require a physical injury to the victim. *Id.* at 1117–18 (citing *Ford,* 330 Md. at 715–16, 625 A.2d at 1000). The court wondered, therefore, how a court or prosecuting authority might determine "to whom the defendant's intent should be transferred" when a bystander suffers no physical injury. *Id.* at 1117. The court stated that "[t]his concern is real":

The world contains many people a murderous assailant does not intend to kill. Obviously, intent to kill one person cannot transfer to the entire world. But how can a jury rationally decide which of many persons the defendant did not intend to kill were attempted murder victims on a transferred intent theory? To how many unintended persons can an intent to kill be transferred? Just as acts with implied malice constitute murder of anyone actually killed, but not attempted murder of others, so, too, acts with the intent to kill one person constitute murder of anyone actually killed, but not attempted murder of others.

*Id.* at 1118. The *Bland* court also recognized that its limit on "transferred intent" did not preclude the prosecution of the defendant for the injury caused to the unintended victim. For example, in California, the defendant "might be guilty of crimes such as assault with a deadly weapon or firing at an occupied vehicle," and the prosecution can use the theory of "concurrent intent" to establish a specific intent with respect to a bystander. *Id.*

The most compelling reason why we reject the doctrine of transferred intent as applied to crimes of attempt is that it is not necessary to make "a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim," the purpose for which it was conceived. *Ford,* 330 Md. at 712, 625 A.2d at 998. When the unintended victim has not suffered a fatal injury, the defendant already has committed a completed crime against the intended victim, and the seriousness of that crime is as great as if the intent were transferred to the unintended victim.

Further, although not in this case, a defendant may be convicted of a crime against an unintended victim with the use of "concurrent intent" and without the use of "transferred intent." Such a defendant also may be convicted of criminal battery, and as Judge Moylan suggested in *Harvey v. State,* 111 Md.App. 401, 430, 681 A.2d 628, 643 (1996), "the crime of reckless endangerment is also available to pick up much of the slack and to make resort to the transferred intent doctrine less compelling." There is little, if any, utility in extending the doctrine of "transferred intent" to inchoate crimes such as attempted murder.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RE-SPONDENT.*

RAKER, J., dissenting.

I would affirm the judgment of conviction based on the

doctrine of transferred intent.[1] The majority, in my view, is misguided in its approach in embracing the legal fiction of "concurrent intent" but in rejecting the common law doctrine of "transferred intent" to the circumstances of this case.

## I.

This is a "bad aim" case, where the intended victim was not harmed, and the unintended victim was injured, but did not die. Petitioner's intent to kill the intended victim should be "transferred" to the unintended victim, thereby holding petitioner accountable for the crime he committed against Mr. Cook, the unintended victim.

Petitioner was convicted of attempted second degree murder of James Cook, and a handgun violation. It is not disputed that petitioner fired six shots from his .38 caliber handgun at a person known as Valentine, missed him and instead struck a bystander, James Cook. Attempted second degree murder requires that petitioner had a specific intent to kill. Although petitioner did not in fact have a specific intent to kill Cook, the State did prove beyond a reasonable doubt that he had a specific intent to kill Valentine. I believe that intent is "transferred" to Cook, and the evidence was sufficient to support the verdict under the doctrine of transferred intent.

---

1. The theory underlying the doctrine of transferred intent was well stated in the case of *People v. Scott*, 14 Cal.4th 544, 59 Cal.Rptr.2d 178, 927 P.2d 288 (1996), explaining that intent is not *actually* transferred. The California Supreme Court explained as follows:

"The legal fiction of transferring a defendant's intent helps illustrate why, as a theoretical matter, a defendant can be convicted of murder when she did not intend to kill the person *actually killed.* The transferred intent doctrine does not, however, denote an actual 'transfer' of 'intent' from the intended victim to the unintended victim. Rather, as applied here, it connotes a *policy*—that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark. It is the policy underlying the doctrine, rather than its literal meaning, that compels the conclusion that a transferred intent instruction was properly given in this case."

*Id.* at 292 (citations omitted).

In my view, the doctrine of transferred intent is applicable to attempted murder cases where the unintended victim is injured.[2] *See Poe v. State*, 341 Md. 523, 671 A.2d 501 (1996), (Raker, J. concurring) (maintaining that transferred intent is applicable to attempted murder). *See also, People v. Valentin*, 347 Ill.App.3d 946, 283 Ill.Dec. 768, 808 N.E.2d 1056 (2004) (holding that transferred intent applies to attempted murder cases where the unintended victim is not killed); *People v. Ephraim*, 323 Ill.App.3d 1097, 257 Ill.Dec. 291, 753 N.E.2d 486, 496–97 (2001) (explicitly rejecting *Harvey v. State*, 111 Md.App. 401, 681 A.2d 628 (1996), and holding that transferred intent is applicable in attempted second degree murder cases where the unintended victim is injured); *Ochoa v. State*, 115 Nev. 194, 981 P.2d 1201, 1205 (1999) (holding that "the doctrine of transferred intent is applicable to all crimes where an unintended victim is harmed as a result of the specific intent to harm an intended victim whether or not the intended victim is injured"); *Blanche v. State*, 690 N.E.2d 709 (Ind.1998) (attempted murder); *State v. Rodriguez–Gonzales*, 164 Ariz. 1, 790 P.2d 287 (1990) (attempted first-degree murder); *State v. Gillette*, 102 N.M. 695, 699 P.2d 626 (1985) (attempted first-degree murder); *State v. Alford*, 260 Iowa 939, 151 N.W.2d 573 (Iowa 1967) (assault with intent to commit murder), overruled on other grounds by *State v. Bester*, 167 N.W.2d 705 (Iowa 1969); *State v. Thomas*, 127 La. 576, 53 So. 868 (1910) (willfully shooting at another with intent to commit murder). As these cases reason, so long as there is evidence of an intent to kill, it makes no difference that someone other than the intended victim was killed or injured.

The majority employs the lack of necessity argument in rejecting the doctrine of transferred intent in the context of an

---

**2.** Today the Court criticizes the use of transferred intent in attempted murder by stating that the charge does not require the victim to suffer physical injury, and thus, the doctrine could result in an endless number of attempted murder charges against a defendant. *See* maj. op. at 507–08. This is not a necessary conclusion. As I have previously noted, "the correct interpretation is that transferred intent should not apply to attempted murder if no one is injured." *Poe v. State*, 341 Md. 523, 535, 671 A.2d 501, 507 (1996) (Raker, J., concurring).

attempt, stating that "[t]he most compelling reason why we reject the doctrine of transferred intent as applied to crimes of attempt is that it is not necessary to make 'a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim.'" Maj. op. at 508 (citations omitted). The majority reasons that "[w]hen the unintended victim has not suffered a fatal injury, the defendant already has committed a completed crime against the intended victim, and the seriousness of that crime is as great as if the intent were transferred to the unintended victim." *Id.* at 508. In addition, rationalizing that there is little utility in "extending" the doctrine of transferred intent, the majority concludes that although not in this case, "concurrent intent" rather than transferred intent will apply to defendants who commit crimes against unintended victims. *See id.*

The majority's reasoning is incomplete and flawed. First, the majority adds an artificial requirement of *death* of the unintended victim to the transferred intent doctrine.[3] Second, Maryland has repudiated the reasoning that simply because the defendant has committed a *completed* crime against the intended victim the doctrine does not apply.[4] Finally, the notion that the doctrine is unnecessary because concurrent intent or other crimes are available to the State is wrong,

---

**3.** The doctrine of transferred intent is not limited to killings. *See e.g., State v. Thomas,* 127 La. 576, 53 So. 868, 871 (1910) (citing *The Queen v. Latimer,* 17 Q.B.D. 359 (1886)); Anthony M. Dillof, *Transferred Intent: An Inquiry into the Nature of Criminal Culpability,* 1 Buff.Crim. L.Rev. 501, 504 (1998). It is instead "a general principle which permits liability for any crime involving a *mens rea* of intent—be it arson, assault, theft or trespass—where the actual object of the crime is not the intended object." *Id.* Neither history nor policy supports a limitation of the transferred intent doctrine to cases resulting in death. *See Poe,* 341 Md. at 537–39, 671 A.2d at 508 (Raker, J., concurring, noting that American courts, following the English precedents, have applied transferred intent to cases where the unintended victim was injured but not killed).

**4.** Almost every jurisdiction has rejected the *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993) opinion reasoning that transferred intent is not applicable where the crime has been "completed" with the death of the intended victim but an unintended victim also dies. *See e.g., State v.*

particularly in this case. Most likely, because concurrent intent was not applicable, and transferred intent does not apply, petitioner will escape punishment for the harm he inflicted upon Mr. Cook.[5] This is evident in the mandate, as the current case was not remanded for a new trial.

## II.

Transferred intent is a common law doctrine which has long been a part of the law in Maryland. *See State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988); *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974). The classic application, or the so-called standard application, of transferred intent is where the defendant, *A,* intends to kill *B,* shoots but misses, and kills *C.* In that situation, "the state of mind which one has when about to commit a crime upon one person is considered by law to exist and to be equally applicable although the intended act affects another person." *Gladden,* 273 Md. at 404, 330 A.2d at 188. Judge O'Donnell, writing for the Court in *Gladden,* explained further that "if one intends injury to the person of another under circumstances in which such a mental element consti-

---

*Hinton,* 227 Conn. 301, 630 A.2d 593, 599 (1993) (noting that "we reject defendant's argument that the successful killing of the intended victim prevents the transfer of that intent to an unintended victim" (citations and internal quotations omitted)).

5. The doctrine of transferred intent is one form of imputed liability. Professor Paul H. Robinson, in his law review article, *Imputed Criminal Liability,* 93 Yale L.J. 609 (1984), explains as follows:

"The definition of an offense describes the elements normally required to hold an actor liable for the offense; it is that offense's paradigm for liability. Despite the absence of required elements of the definition, an actor may be held liable for the offense if a doctrine serves to impute the absent elements. Such a doctrine does not alter the definition of an offense but rather provides an alternative means of establishing the required elements, or at least an alternative means of treating the defendant *as if* the required elements were satisfied. For the most part, the principles underlying imputation reflect concerns beyond those of the offense at hand. A single doctrine of imputation may apply to a range of offenses or to all offenses. As a group, instances of imputed liability play as significant a role in criminal law theory as do general defenses."
*Id.* at 675.

tutes *mens rea*, and in the effort to accomplish this end he inflicts harm upon a person other than the one intended, he is guilty of the same kind of crime as if his aim had been more accurate." *Id.* (citations and internal quotations omitted); *see also* 1 W. LaFave & A. Scott, *Substantive Criminal Law*, § 3.12(d) (1986, 2003 Supp.) (explaining transferred intent to mean that "where *A* aims at *B* but misses, hitting *C*—it is the view of the criminal law that *A* is just as guilty as if his aim had been accurate. Thus where *A* aims at *B* with a murderous intent to kill, but because of a bad aim he hits and kills *C*, *A* is uniformly held guilty of the murder of *C* ").

After today's decision, the doctrine of transferred intent will still be a part of Maryland law, albeit more limited in its application. The question arises in this case as to whether transferred intent is applicable when *C* does not die but is injured. There is an ongoing debate around the country, within the courts and commentators, as to the applicability of the doctrine of transferred intent. Commentators and courts have described the doctrine as "defective," a "curious survival of the antique law," and one having no proper place in the criminal law. *See* Anthony M. Dillof, *Transferred Intent: An Inquiry into the Nature of Criminal Culpability*, 1 Buff.Crim. L.Rev. 501, 502–03 (1998). Despite the views of detractors, a "roughly equal number of commentators . . . have approved of the doctrine and its result." *Id.* In my view, the doctrine of transferred intent should apply to the crime of attempted murder, for example, when a person, *A*, intentionally shoots a gun at *B*, intending to kill *B*, and because of bad aim or luck, hits but does not kill, or even misses, *B*, and strikes and injures *C*. *See Poe*, 341 Md. at 539, 671 A.2d at 509 (Raker J., concurring, joined by Rodowsky and Karwacki, J.J.). *A* should not escape punishment for the act committed against *C* simply because that person had bad aim or good luck. *See id.*

This Court addressed the question of whether transferred intent applies to attempted murder in *State v. Wilson*, and, noting specifically the split in jurisdictions around the country as to the applicability of transferred intent, we "align[ed] ourselves with the numerous jurisdictions which have applied

the transferred intent doctrine to specific intent crimes including attempted murder." 313 Md. at 607, 546 A.2d at 1044. In *Wilson*, the intended target, Brown, was not harmed physically, and the unintended victim, Kent, was struck with the bullets but did not die. *See id.* at 601–02, 546 A.2d at 1042. The defendant was charged with attempted murder of both the intended target and the unintended target. *See id.* at 602, 546 A.2d at 1042. We made clear that the doctrine of "transferred intent" was not limited to homicide cases but extends to all situations where a defendant's intended act " 'affects' or 'inflicts harm upon' an unintended victim." *Id.* at 604, 546 A.2d at 1043 (citations omitted). The Court reasoned that a necessary element of murder is malice and that inasmuch as the State proved the malice element by establishing Wilson's specific intent to kill Brown, Wilson would have been guilty of premeditated murder had the unintended victim Kent died. *See id.* Accordingly, the elements of attempted murder were satisfied when Kent survived. *Wilson*, in my view, was decided and reasoned correctly.

Subsequent to *Wilson*, the doctrine of transferred intent took a sharp and sudden turn, beginning with the *dicta* in *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993), and resulting in the conclusion today. The majority attempts to recount the life and limitations of the doctrine of transferred intent in Maryland, but does so in a selective manner. The Court omits the shift in reasoning from *Ford* to *Poe*, a change which has been described as "result-oriented." *See* Note, *Confusing the Doctrine of Transferred Intent*, 56 Md. L.Rev. 744, 744 (1997). *See also*, Mitchell Keiter, *With Malice Toward All: The Increased Lethality of Violence Reshapes Transferred Intent and Attempted Murder Law*, 38 U.S.F. L.Rev. 261, 280 (2004) (discussing *Ford*, noting that "[t]he *Ford* court faced the dual task of repudiating the reasoning of a precedent that had authorized replicated intent for attempted murder, while preserving that case's result of multiple attempted murder convictions").

The doctrine of transferred intent in Maryland was set out, and judicially embraced, in *Gladden*. The Court looked at the

"classic" doctrine of transferred intent, and held that when an individual kills one person but actually intended to kill another, transferred intent applies. The *Gladden* Court pointed out that under the common law, the doctrine was as follows:

> "Sir William Blackstone, in 4 Commentaries on the Laws of England (Cooley, 3d ed., 1884), at 201 stated the common law rule to be:
>
>> 'Thus if one shoots at A and misses *him*, but kills B, this is murder; because of the previous felonious intent, which the law transfers from one to the other. The same is the case where one lays poison for A; and B, against whom the prisoner had no malicious intent, takes it, and it kills him; this is likewise murder.' "

273 Md. at 391–92, 330 A.2d at 181. The Court continued:

> "In Clark and Marshall, A Treatise on the Law of Crimes § 10.06 (6th ed., 1958), at 578, the rule is stated as follows:
>
>> 'Whenever an accountable man kills another intentionally, he is guilty of murder with express malice unless the killing is justifiable or excusable, or unless there are such circumstances of provocation as will reduce the homicide to manslaughter. This principle is applied when a man kills one person when he intended to kill another. For example, if a man shoots at one person with intent to kill him, and unintentionally kills another, or sets poison for one person and another drinks it and dies, it is murder with express malice of the person killed, though he is a friend.'
>
> Although admittedly the doctrine is of 'ancient vintage,' we do not agree with the petitioner's contention that under modern statutory classifications it is a 'curious survival of the antique law' requiring its rejection. It has lost none of its patina by its application over the centuries down unto modern times; its viability is recognized by its current acceptance and application."

*Id.* at 392, 330 A.2d at 181.

*State v. Wilson* followed, and applied *Gladden*. The *Wilson* Court determined that the doctrine of transferred intent was

not limited solely to completed homicides. Following a review of public policy, history, and the applicability of *stare decisis*, the Court held that transferred intent applies to the crime of attempted murder. *See Wilson*, 313 Md. at 609, 546 A.2d at 1045.

Next came *Ford*, the basis of the majority's holding. In my view, the *Ford* opinion, as it relates to transferred intent, is no longer, if it ever was, of persuasive value. In that case, a bare majority of the Court, in pure *dicta*, and in what the Court conceded was a "somewhat collateral issue," *Ford v. State*, 330 Md. at 708, 625 A.2d at 996, announced that "[w]here the crime intended has *actually been committed* against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims." *Id.* at 712, 625 A.2d at 998 (emphasis added). The Court concluded that transferred intent did not apply to attempted murder, noting, however, that the conclusion was at odds with the recent holding of *State v. Wilson*. *See id.* at 713, 625 A.2d at 999.

Notably, Judge Chasanow, writing for the majority, did not limit the gratuitous discussion to the applicability of transferred intent to completed homicides, but went on to state that transferred intent did not apply where the crime against the intended victim was "complete." The Court stated as follows:

"The underlying rationale for the doctrine also suggests that transferred intent should apply only when, without the doctrine, the defendant could not be convicted of the crime at issue because the mental and physical elements do not concur as to either the intended or the actual victim."

*Id.* at 711, 625 A.2d at 998.

Three judges of the Court disagreed with this reasoning. Judge McAuliffe, joined by Judges Rodowsky and Karwacki, concurred in the result, yet declined to join the court's *dicta* pertaining to transferred intent. In particular, Judge McAuliffe, characterizing the Court's limitation of the doctrine as unnecessary and ill-advised, rejected the majority's statement that the doctrine of transferred intent could not be applied,

"where the crime intended has actually been committed against the intended victim." *Id.* at 724, 625 A.2d at 1004.

Under the *Ford* rationale, where the intended and unintended victims died, the doctrine of transferred intent is not applicable because the intended crime was completed. *Ford* relied heavily on *People v. Birreuta*, 162 Cal.App.3d 454, 208 Cal.Rptr. 635 (1984), the California intermediate appellate court opinion which has since been repudiated in California, as well as every other court in the country considering the issue. *See People v. Bland*, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, 1113–1115 (2002) (noting that the conclusion in *Birreuta* was incorrect, disapproving *People v. Birreuta* to the extent it holds that intent to kill does not transfer to an unintended homicide victim even if the intended target is killed, and holding that intent to kill transfers to an unintended homicide victim even if the intended person is killed); *State v. Hinton*, 227 Conn. 301, 630 A.2d 593, 598–599 (1993) (expressly disagreeing with *Birreuta* ). Even Maryland has since rejected this limitation on the doctrine. *Compare Ford* with *Poe.*

The next significant case in Maryland to address transferred intent was *Poe v. State.* Again, in pure *dicta* rejecting transferred intent to attempted murder, Judge Chasanow, writing for the majority, explained, and without admitting as much, backpedaled from the *Ford* rationale that transferred intent would apply only to cases where the intended crime was not completed. Instead, calling *Poe* "a classic case of transferred intent," 341 Md. at 529, 671 A.2d at 503, the majority somehow reasoned that the doctrine *did* apply, even though the crime of attempted murder was complete when Poe fired the gun at Ms. Poe, hitting, but failing to kill her. *See id.* at 528–29, 671 A.2d at 503. Thus, when a defendant, intending to kill one person, shoots and wounds that person, but the bullet passes through the intended victim and kills an unintended victim, the doctrine is applicable.

In a student note, *Poe v. State: The Court of Appeals of Maryland Limits the Applicability of the Doctrine of Trans-*

*ferred Intent,* 27 U. Balt. L.Rev. 167 (1997), the author, Daniel J. Curry, traces the doctrine of transferred intent in Maryland. He concludes that "a defendant who attempts to kill their intended victim but instead injures an unintended victim should be held liable under transferred intent for attempted murder of the unintended, injured victim." *Id.* at 182. Discussing the majority and concurring opinions in *Poe,* the perceptive author concluded that "Judge Raker's reasoning is more sound than the majority's because it does not preclude the use of the doctrine in attempted murder prosecutions. Judge Raker's clarification was in tune with the elements of the doctrine as it is commonly applied." *Id.* at 186.

I reiterate my predication in *Poe:*

"If the majority's opinion is interpreted to preclude any use of the doctrine of transferred intent in attempted murder prosecutions, the effect of the decision will be to substantially increase the difficulty of prosecuting criminals for the harm inflicted on innocent bystanders. ... Without transferred intent, the State will be required to offer separate proof of intent for each victim, e.g., by demonstrating 'depraved heart [or concurrent intent].' While firing a 'hail of bullets' at a person on a busy street may be *prima facie* evidence of a depraved heart, numerous factual situations may arise where it will be difficult to demonstrate recklessness."

341 Md. at 539–40, 671 A.2d at 509. The instant case demonstrates just such a situation. Today's ruling has rewarded petitioner for his bad aim, and will likely result in similar rewards for others in the future.